O'MELVENY & MYERS LLP
Bernard V. Kleinman, Esq.. June 15, 2001 - Page 2

Very truly yours,

Tancred V, Schiavoni
for O'MELVENY & MYERS LLP

cc: Martin Armstrong
NY1:812179.1

Destanis, Dn Home Delivery, Katherine Geissler, G & G News, Inc., Pasquale Campinelli, Camris, Inc., Douglas A. Barr, Princewood Home Delivery, Inc., Joseph Lioce, Plaintiffs,

v.

DAILY NEWS, L.P., John Doe and Jane Doe # 1–50, Defendants.

No. 00 CIV. 1305(VM).

United States District Court, S.D. New York.

July 23, 2001.

Francis MATHIAS, Weimar News Delivery, Inc., Lucian Debonis, Debonis News Home Delivery, Inc. Tom Winter, Tomco Newspaper Delivery, Christine Destefano, Chrisco News Home Delivery Service, Joseph Fay, Christopher Cirri, Joseph Parrinello, C & F Newspaper Home Delivery Service, Inc., Christos Matiatos, Dawn News, Inc., Paul D'Agostino, C.C. Swen, Inc., Nick Calabrese, C & G News, Inc. Daniel Scalero, D & L News, Michael D'Esposito, D'Esposito Daily News, Maria Gagolewski, M.N.S. News, Nick

Andrew J. Campanelli, Perry, Kearon & Campanelli, L.L.P., Westbury, NY, for Plaintiffs.

### *DECISION AND ORDER*

MARRERO, District Judge.

### I. *INTRODUCTION*

This case originated in New York State Supreme Court, Richmond County, where

plaintiffs, a group of independent newspaper delivery firms (the "Carriers"), alleged that defendant Daily News, L.P. (the "Daily News") breached its contractual obligations with respect to certain independent home delivery agreements in force with the Carriers. After discovery and some motion practice, the Carriers filed a parallel action in this Court alleging essentially the same wrongful conduct, but adding a number of claims under § 2 of the Clayton Act,[1] as amended by § 1 of the Robinson–Patman Act,[2] and §§ 1 and 2 of the Sherman Act.[3]

The Carriers allege five causes of action under federal law in this Court, numbered and labeled as follows:

- First: "Indirect Price Discrimination," in violation of § 2(a) of the Clayton Act, also referred to as the "primary-line price discrimination claim."
- Second: "Price Discrimination—Treble Damages and Injunction," pursuant to §§ 2(a), (d) and (e)[4] of the Clayton Act, also referred to as the "secondary-line price discrimination claim."
- Third: "Conspiracy in restraint of trade," in violation of § 1 of the Sherman Act.
- Fourth: "Further Conspiracy in restraint of Trade," in violation of § 2 of the Sherman Act, or the "monopolization claims."
- Twelfth: "Vertical restraint of trade, monopolization, and price-fixing," which the

Court refers to as the "maximum resale price maintenance claim."[5]

The Daily News now moves under Rule 12(b)(6) of the Federal Rules of Civil Procedure (hereinafter the "Daily News's Motion") for dismissal of all federal claims for failure to state a claim for relief and, consequently, for dismissal of the remaining state law claims on the ground that the exercise of supplemental jurisdiction would be improper. Alternatively, the Daily News moves for a stay of all proceedings pending disposition of the original action in state court. In addition, a group of purported individual defendants move pursuant to Rules 12(b)(4) and (b)(5) of the Federal Rules of Civil Procedure to dismiss the complaint because of purported deficiencies in service of process (hereinafter the "Individual Defendants' Motion").

For the reasons set forth below, the Daily News's Motion is granted as to the Carriers' First, Third, Fourth and Twelfth causes of action. The only viable federal cause of action that remains against the Daily News is the Carriers' Second claim alleging secondary-line price discrimination. Because the Court sustains this claim, dismissal of the state law claims is unwarranted at this time. Furthermore, the Individual Defendants' Motion is granted. The Carriers are granted leave to file an amended complaint within 20 days of the date of this Decision and Order.

---

1. 15 U.S.C. § 13 (1997).

2. Robinson–Patman Price Discrimination Act, ch. 592, 49 Stat. 1526 (1936) (codified as amended at 15 U.S.C. § 13 (1997)).

3. 15 U.S.C. §§ 1 & 2 (1997).

4. Although the Carriers' claims under §§ 2(d) and (e) of the Clayton Act are not explicitly stated under the Second cause of action heading, the Carriers make reference to their claims of discriminatory advertising in

¶ 46(C) of the complaint. *See* discussion *infra*, Part V and note 10.

5. The Carriers' remaining claims brought under state law consist of causes of action for conspiracy to lure key workers; interference with the business relationships with customers; breach of contract; violations of the New York Fair Trade Law; unjust enrichment; detrimental reliance; and conversion.

## II. *FACTS AND PROCEDURAL HISTORY*

The Carriers are residents of the State of New York and are engaged in the business of newspaper home delivery in Brooklyn and Staten Island. (Compl.¶¶ 4–36). The Daily News publishes, markets and distributes the *Daily News* (the "Newspaper") and has its principal place of business in the State of New York. (Compl.¶¶ 37, 39). Defendants John Doe Nos. 1–50 and Jane Doe Nos. 1–50 (the "Alternate Carriers") are engaged in the business of home delivery of the Newspaper, either as employees, agents, or independent carriers. (Compl.¶ 38).

Since the 1960's, the Daily News has distributed the Newspaper through a number of independent contractors who signed "Carrier Agreements," granting the contractors primary responsibility for home delivery of the Newspaper in specifically defined territories. (Compl.¶¶ 40–42). All of the Carriers have signed such Carrier Agreements with the Daily News. (Compl.¶ 44). Pursuant to these agreements, the Carriers are solely responsible for billing (including setting the price) and collecting remittance from their home delivery customers. (Compl.¶ 46(L)). The Carrier Agreements provide that nothing in the contracts shall "restrict the right of either party to buy from or sell to any person anywhere other copies of the News . . . ." Defendants' Notice of Motion to Dismiss, dated May 31, 2000, Ex. C, section III.

Since approximately 1995, the Daily News has implemented a "pay-by-mail" program, under which it sells the Newspaper directly to customers. (Compl.¶ 46(M)). Under this program, the Daily News mails bills directly to customers and directs these customers to mail payments directly back to it. (Compl.¶ 46(P)). The Daily News then pays either the Carriers or the Alternate Carriers a fee to deliver a copy of the Newspaper to each customer. (Compl.¶¶ 46(O) & (P)). Although not clearly stated in the complaint, the Carriers suggest that there is at least one other possible mode of distribution for pay-by-mail, that is, sales of the Newspaper to other independent delivery firms which, in turn, resell directly to the customer. (Compl.¶ 46(B)). The Carriers contend that this "pay-by-mail" program places the Daily News in direct competition with the Carriers for the sale of the Newspaper to home delivery customers. (Compl.¶¶ 51, 52).

According to the Carriers, after entering the market for direct sales to customers, the Daily News adopted new business practices designed to hamper the Carriers' ability to compete. These practices include (1) changing the methods and schedules for delivery of the Newspaper to independent carriers; (2) instituting a computer-based information tracking system, also known as "DISCUS," without properly training the Carriers and failing to grant them access to that vital information; (3) adopting a centralized customer complaint system which impeded the Carriers' ability to respond to their customers' service concerns; and (4) improperly retaining gratuities earmarked for the Carriers' delivery personnel. (Compl.¶¶ 46(E)-(P)).

The Carriers also accuse the Daily News of serious violations of the antitrust laws. They allege that the Daily News has sold the Newspaper to the Alternate Carriers and other home delivery customers at below-cost prices or at prices not yielding a reasonable return. (Compl.¶¶ 46(A) & (B)). Further, they assert that the Daily News has guaranteed below-cost pricing to favored carriers for long periods of time, sometimes more than a year, but that the

Daily News has never offered these preferential prices to the Carriers. (Compl.¶ 46(B)).

The Carriers also assert that the Daily News conspired with others to systematically exclude them from the home delivery business and that the Carriers were forced to buy the Newspaper from the Daily News at "unreasonably high prices." (Compl.¶¶ 71, 72). Finally, the Carriers allege that the Daily News fixed and maintained the prices at which the Carriers could sell the Newspaper to customers and that they were injured because they were prevented from charging more than the Daily News's price. (Compl.¶¶ 164(D), 166–67).

The Daily News's Motion asserts that none of the five federal causes of action sufficiently pleads violations of the antitrust laws. The Individual Defendants also move to dismiss the complaint for improper service of process.

## III. STANDARD OF REVIEW UNDER RULE 12(b)(6)

In considering a motion to dismiss under Rule 12(b)(6), the Court is obliged to accept the well-pleaded assertions of fact in the complaint as true and to draw all reasonable inferences and resolve doubts in favor of the non-moving party. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995) (citations omitted); *Global Discount Travel, L.L.C. v. Trans World Airlines, Inc.,* 960 F.Supp. 701, 704 (S.D.N.Y.1997) (citations omitted). The focus of the Court's inquiry is not whether plaintiffs will ultimately prevail, but whether the claimants are entitled to an opportunity to offer evidence in support of their claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Therefore, a motion

to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Under the Federal Rules of Civil Procedure, the standard for assessing the sufficiency of a complaint in an antitrust action is the same as in any other case: "a short, plain statement of a claim for relief which gives notice to the opposing party is all that is necessary." *See George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977); *Global Discount Travel,* 960 F.Supp. at 704; Fed.R.Civ.P. 8(a). Nevertheless, courts have warned that "conclusory allegations which merely recite the litany of antitrust will not suffice. This court retains the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 163 (S.D.N.Y. 1991) (citations omitted).

## IV. PRIMARY–LINE PRICE DISCRIMINATION

■ In their First cause of action, the Carriers assert a primary-line price discrimination claim pursuant to § 2(a) of the Clayton Act, as amended by the Robinson–Patman Act. Primary-line price discrimination occurs when a seller's discriminatory pricing injures the seller's direct competitors. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 220, 113 S.Ct. 2578, 125 L.Ed.2d 168, *reh'g denied,* 509 U.S. 940, 114 S.Ct. 13, 125 L.Ed.2d 765 (1993); *George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 141 n. 2 (2d Cir.1998). Thus, a primary-line Robinson–Patman Act claim contemplates price discrimination by the defendant among its customers in an attempt

to harm those competing with the defendant for those sales. *See, e.g., Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, 88 F.Supp.2d 133, 137 n. 1 (S.D.N.Y.2000); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 188 (1st Cir.), *cert. denied*, 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996); Julian O. Von Kalinowski, et al., *Antitrust Law and Trade Regulation: Desk Edition* § 5.01[2], at 5–7 to 5–8 (2000) (hereinafter "Von Kalinowski"). The Carriers contend that they compete directly with the Daily News for sale of the Newspaper to customers as a result of the Daily News's institution of a competing distribution system that operates in the Carriers' previously assigned marketing territories. (Compl.¶ 51).

■ To succeed on a claim of primary-line price discrimination, plaintiffs must prove that: "(1) the alleged price discrimination meets the 'in commerce' requirement, i.e., that 'either of any' of the purchases involved are in commerce; (2) there has been discrimination in price between different purchasers of products of like grade and quality; and (3) the effect of the discrimination may be substantially to lessen competition or tend to create a monopoly." *See Cardinal Indus., Inc. v. Pressman Toy Corp.*, No. 96 Civ. 4590, 1996 WL 724730, at *3 (S.D.N.Y. Dec. 17, 1996) (quotations omitted); *see also John B. Hull, Inc. v. Waterbury Petroleum Prods.*, 588 F.2d 24, 27 (2d Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).

Although their allegations with respect to the first two elements are sparse, the Carriers have pleaded the bare minimum necessary to satisfy those elements. The Carriers allege that

[d]efendants have sold the News, wholesale, at prices below cost, or at margins of profit not yielding a reasonable return on gross sales, with the intent and effect of restraining, suppressing, destroying, and eliminating the competition of Plaintiffs and other independent dealers.... In some instances, Defendant Publisher has guaranteed below cost prices to the Defendants/Alternate Carriers *and other home delivery customers* for periods as long as one year or more, but has never offered below cost pricing to the Plaintiffs.

(Compl.¶ 46(B) (emphasis added)). The Carriers also allege that, "[t]he Publisher is further engaged in selling and distributing its publication in interstate commerce to readers or other purchasers throughout the United States." (Compl.¶ 39). Although the Daily News disputes each of these points,[6] the Carriers have provided a short, plain statement of these elements sufficient to give notice to the Daily News of these aspects of a claim for relief.

The insufficiency of the Carriers' pleading becomes apparent in connection with the third element, often referred to as the competitive injury requirement. This element of primary-line price discrimination claims has been the source of confusion and the subject of extensive scholarly debate. *See Cardinal Indus.*, 1996 WL 724730, at *3; *George Haug*, 148 F.3d at 141 ("[t]he language in Section 2(a) relating to injury to competition is the key to the legality of most differential pricing practices and has engendered significant legal uncertainty ....").

The confusion arose in the aftermath of the Supreme Court's decision in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 693–98, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), where the Court, in effect, permit-

6. *See* discussion *infra*, Part V, for an elabora-
tion of the interstate commerce requirement.

ted an inference of injury to competition to be drawn from proof of predatory intent. *See also Cardinal Indus.*, 1996 WL 724730, at *3. In *Utah Pie*, 386 U.S. at 693–98, 87 S.Ct. 1326, the plaintiff had introduced both objective and subjective evidence of the defendant's predatory intent, including evidence of below-cost pricing and express indications of the defendant's intent to injure plaintiff. Applying the rationale of *Utah Pie*, lower courts have inferred primary-line competitive injury from evidence of predatory intent. *See Cardinal Indus.*, 1996 WL 724730, at *3.

However, in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), the Supreme Court sought to clarify *Utah Pie* with respect to the weight of a defendant's subjective intent: "[a]s the law has been explored since *Utah Pie*, it has become evident that primary-line competitive injury under the Robinson–Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act." By harmonizing the competitive injury requirements under the Robinson–Patman Act and the Sherman Act, the Court effectively abrogated the inference of competitive injury permitted under *Utah Pie. See Cardinal Indus.*, 1996 WL 724730, at *3.

Since *Brooke Group*, the Second Circuit has recognized the requirement for pleading competitive injury in primary-line price discrimination cases. *See George Haug*, 148 F.3d at 143. Furthermore, courts in this Circuit have applied a two-prong test, derived from *Brooke Group*, for establishing such injury. The plaintiff must show that (1) competitive injury re-

sulted from a rival's prices that were below an appropriate measure of the rival's costs and (2) the competitor had a reasonable prospect of later recouping its investment in below-cost prices, or, in other words, there was a reasonable likelihood that the competitor could succeed in diminishing or eliminating competition and subsequently raise prices in order to offset its earlier expected losses. *See Cardinal Indus.*, 1996 WL 724730, at *4.

By imposing this two-part test for primary-line price discrimination cases, the Supreme Court harmonized the competitive injury requirements in discriminatory pricing actions under the Robinson–Patman Act and predatory pricing schemes under § 2 of the Sherman Act. Although it recognized material differences in the language of the two statutes, the Court stated that the essence of a claim under both statutes is identical: "A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." *Brooke Group*, 509 U.S. at 222, 113 S.Ct. 2578.

The Court reasoned that the first prong of the competitive injury requirement is necessary because only below-cost pricing can inflict competitive injury. *See id.* at 223, 113 S.Ct. 2578. This finding reflected, in part, the Court's recognition that above-cost pricing that remains below general market prices is more often competition-enhancing. *See id.* Any condemnation of above-cost price cutting carries the risk of depriving consumers of lower prices, while protecting weak competitors from lost profits—a result that contradicts established antitrust policy.[7]

***

7. As the Supreme Court noted, "[t]o hold that the antitrust laws protect competitors from the loss of profits due to such price

competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws

The second prong of the primary-line price discrimination test requires the plaintiffs to show that the defendant had a reasonable prospect of recouping its investment in below-cost prices. *See Brooke Group*, 509 U.S. at 224, 113 S.Ct. 2578; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 584–85 n. 8 & 592 n. 16, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In order for discriminatory pricing to be anticompetitive, the predatory firm must succeed in eliminating would-be price cutters and in charging higher prices later to compensate for price cutting in the short run. *See Matsushita*, 475 U.S. at 592, 106 S.Ct. 1348. Absent the reasonable possibility of success in such recoupment, below-cost pricing cannot be anticompetitive because a failed predatory pricing scheme only results in lower aggregate prices for the consumer, again, a pro-competitive outcome. *See Brooke Group*, 509 U.S. at 224, 113 S.Ct. 2578; *Matsushita*, 475 U.S. at 594, 106 S.Ct. 1348 ("cutting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly because they chill the very conduct the antitrust laws are designed to protect.").

Thus, both prongs of the competitive injury test exist to ensure that the antitrust laws are not wielded to suppress vigorous competition. In other words, the test forces courts to distinguish between clearly anticompetitive below-cost pricing and price discrimination that promotes competition. *See Cardinal Indus.*, 1996 WL 724730, at *4 (the two-part test "filter[s] out acts of price discrimination that increase competition.").

In the context of a Rule 12(b)(6) motion, *Cardinal Indus.* held that the failure of the pleadings to assert facts establishing the two prongs of the competitive injury requirement necessitated dismissal: "Plaintiff has failed to allege, even in a conclusory manner, that defendant sold its Jumbo Color Dot Dominoes at below-cost prices or that, even if defendant did so, it could eventually recoup its losses .... Plaintiff has failed to state a claim of price discrimination and defendant's motion to dismiss this claim must be granted." *Id.* at *6.

If the requirements for establishing competitive injury in primary-line price discrimination cases appear difficult even to articulate, it is because the standard is, in fact, exacting. As the Supreme Court noted, "[t]hese prerequisites to recovery are not easy to establish, but they are not artificial obstacles to recovery; rather, they are essential components of real market injury." *Brooke Group*, 509 U.S. at 226, 113 S.Ct. 2578. Nevertheless, this test represents one instance where rigid pleading requirements reflect market realities. Anticompetitive pricing schemes are exceedingly difficult to accomplish: "[T]here is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita*, 475 U.S. at 589, 106 S.Ct. 1348 (citations omitted).

■ Here, the Carriers have made a bare, general allegation that the Daily News priced the Newspaper below cost, but they have failed to allege facts tending to demonstrate that the Daily News had any reasonable prospect of recouping costs. Because the Carriers have failed to allege facts that, if proven, would establish competitive injury, their primary-line price discrimination claim is dismissed. *Id.* at *5–6.

require no such perverse result." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

The Court also cautions that any amended pleading containing more conclusory or boilerplate allegations that the Daily News had a strong chance of recouping profits would not, by itself, rescue the Carriers' claim from dismissal. The likelihood of recoupment depends on a number of complex variables which the Carriers have failed to discuss. The hallmarks of competitive injury as reflected in the case law include, but are not limited to, the following factors: (1) the extent and duration of the alleged price discrimination; (2) the relative financial strength of the predator and its intended victim; (3) an estimate of the cost of the alleged predation; (4) an analysis of likely or unlikely entry by new competitors; (5) the predator's capacity to absorb excess market shares; and (6) the structure of the market and whether competitors will be disciplined enough to raise prices to monopoly levels after the elimination of competition. *See Brooke Group,* 509 U.S. at 225–26, 113 S.Ct. 2578. The Court in *Brooke Group* warned that, "[i]f market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed … [and] summary disposition of the case is appropriate." *Id.* at 226, 113 S.Ct. 2578.

## V. *SECONDARY–LINE PRICE DISCRIMINATION*

■ In contrast to their primary-line price discrimination claim, the Carriers' Second cause of action alleging a secondary-line price discrimination claim stands on slightly stronger footing at this stage in the pleadings. Secondary-line price discrimination occurs when a seller's discrimination among competing purchasers/resellers impacts competition among those purchasers. *See George Haug,* 148 F.3d at 141 n. 2. In essence, a secondary-line claim posits that plaintiffs are part of a competing group of purchasers/resellers and that the seller has unfairly discriminated in price between plaintiffs and other similarly-situated, favored purchasers of the seller. *See, e.g., Intimate Bookshop,* 88 F.Supp.2d at 137 n. 1 ("[s]econdary-line price discrimination occurs when a seller's price discrimination impacts competition among the seller's purchasers, i.e., there are favored and disfavored purchasers."); *Coastal Fuels,* 79 F.3d at 188 ("[t]he theory of injury is generally that the defendant's lower price sales to the plaintiff's competitor (the favored purchaser) placed the plaintiff at a competitive disadvantage and caused it to lose business.").

■ In order to establish a claim of secondary-line price discrimination, plaintiffs must prove that: (1) the sales at issue were made in interstate commerce; (2) the seller discriminated in price as between two purchasers; (3) the products or commodities sold to the competing purchasers were of the same grade and quality; and (4) the price discrimination had a prohibited effect on competition. *See George Haug,* 148 F.3d at 141 (citations omitted). As a predicate to establishing a prohibited competitive effect, plaintiffs must first show that they were actually in competition with a favored purchaser. *See id.* (citing *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 584 (2d Cir.1987)).

■ The Daily News's Motion as it relates to this cause of action rests on three grounds. First, the Daily News claims that the Carriers have failed to allege that sales of the Newspaper were made in interstate commerce. (*See* Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint, dated May 31, 2001 (hereinafter "Defendant's Memorandum"), at 18). The Daily News contends that the Carriers' operations are limited to

Brooklyn and Staten Island, and consequently, that all relevant transactions are entirely intrastate. (*See id.* at 18–19). Second, the Daily News disputes that its transactions with the Alternate Carriers concern the purchase of products or commodities; rather, the Daily News claims that the Alternate Carriers provide a service, specifically delivery services, and therefore, the element requiring discrimination between two purchasers cannot be satisfied. (*See id.* 19–20). Third, the Daily news argues that because the Alternate Carriers are merely delivery agents, and not resellers, the Carriers are not in actual competition with the alleged favored purchasers. (*See* Defendants' Reply Memorandum of Law in Further Support of Motion to Dismiss the Complaint, dated Aug. 7, 2000 (hereinafter "Defendant's Reply Memorandum"), at 7–8).

Whether or not the Daily News's arguments will ultimately prevail after further discovery, the Carriers have alleged enough facts to proceed to discovery. In paragraph 39 of the complaint, the Carriers include a short, plain statement that the relevant sales of the Newspapers were made in interstate commerce.[8] (Compl. ¶ 39). Furthermore, the complaint sufficiently characterizes the transactions between Daily News and its Alternate Carriers as sales of a commodity between producer and purchaser. The Carriers claim that "[d]efendants have *sold* the *News* ... to the *Defendant/Alternate Carriers* and other home delivery customers for periods as long as one year or more, but has never offered below cost pricing to the Plaintiffs." (Compl. ¶ 46(B) (emphasis added)). This allegation is sufficient to suggest that the underlying dispute relates to the sale of the Newspaper, which clearly qualifies as a product or commodity. From an assertion that the Daily News sold the Newspaper to the Alternate Carriers, it could reasonably be inferred that these other allegedly favored purchasers obtained the products for resale, presumably in competition with the Carriers, and thus that they were dealing with a commodity rather than providing a service.

The Daily News challenges the Carriers' contention. It claims that any direct sales that the Daily News makes in the Carriers' territories is accomplished by delivery of the Newspaper through an agent who is paid only for that service. (Defendant's Memorandum at 19–20). The Daily News also asserts that the Alternate Carriers providing a delivery service cannot actually compete with the Carriers, who are resellers. (Defendant's Reply Memorandum at 7). The Court is thus confronted with a basic factual dispute that cannot properly be resolved on a motion to dismiss. Further discovery may in fact sufficiently establish that all direct sales of the Newspaper in the Carriers' territories are accomplished through delivery agents, who do not compete with the Carriers. But accepting the allegations in the complaint as true and in the light most favorable to the opponents of the motion, the Carriers have clearly given notice regarding the elements of a secondary-line violation and raised factual issues as to whether any of the Alternate Carriers purchased commodities at favorable prices, whether those carriers actually competed for sales with the Carriers and whether the products at

8. In their Memorandum of Law in Opposition to Defendant Daily News's Motion, the Carriers clarify that printing originates in New Jersey and sales are made nationwide. Although the Court need not look beyond the complaint in ruling on a motion to dismiss, the assertion that sales were made in interstate commerce appears in the original complaint, and there is clearly an issue of fact that cannot be resolved on a motion to dismiss and that should proceed to discovery.

issue here moved in and affected interstate commerce.

The Supreme Court's decision in *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 563, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990) also counsels against dismissal. Plaintiffs in *Hasbrouck* were retailers of Texaco gasoline who brought suit against Texaco for granting functional discounts to favored distributors. *See id.* at 549–52, 110 S.Ct. 2535. Notwithstanding that plaintiffs and the favored purchasers did not compete at the exact level of the distribution chain, the Supreme Court upheld judgment for the plaintiffs because § 2(a) does not "countenance a functional discount completely untethered to either the supplier's savings or the wholesaler's costs." *Id.* at 562–63, 110 S.Ct. 2535. Although it acknowledged the legality of many forms of functional discounts, the Court also recognized the possibility that functional discounts could be used as "subterfuges" to avoid the proscriptions of § 2(a). *Id.* at 563, 110 S.Ct. 2535. Given the Court's holding in *Hasbrouck*, it would be premature to grant the Daily News's Motion on the stated grounds without giving the Carriers an opportunity to prove de facto competition with the Alternate Carriers and actual price discrimination.

Upon establishing a competitive relationship, the Carriers must also plead harm to competition in order to satisfy the fourth element of a secondary-line price discrimination claim. *See George Haug*, 148 F.3d at 142. It is important to note that a secondary-line price discrimination claim does not require the same competitive injury showing as a primary-line claim. In a secondary-line claim, "[i]t is hornbook law ... that anticompetitive injury need not be alleged to sustain a claim for violation of the Robinson–Patman Act." *Id.* at 140. Competitive injury may be inferred from evidence of injury to an individual competitor, and "[m]ore specifically, *Morton Salt*[9] permits an inference of injury to competition from evidence of a substantial price difference over time." *Id.* at 142.

The "prohibited effect" prong is satisfied at this stage by the allegation that the Daily News discriminated in price between resellers for an extended period of time. (Compl.¶ 46(B)). Thus, the Carriers have alleged the requisite elements of a secondary-line price discrimination claim in their complaint. Accordingly, the Daily News's Motion to dismiss the Carriers' Second cause of action is denied.[10]

---

**9.** In *FTC v. Morton Salt Co.*, 334 U.S. 37, 46–47, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), the Supreme Court held that in secondary-line price discrimination cases, competitive injury may be inferred from evidence of injury to an individual competitor. The Court explained that the Robinson–Patman Act was concerned with protecting small businesses and that § 2(a) was intended to allow evidence of injury to a competitor to suffice as evidence of injury to competition. *See id.* at 49, 68 S.Ct. 822. Furthermore, the inference was warranted because a substantial price difference over time creates a reasonable possibility of harm to competition itself. Although *Brooke Group*, clearly imposed a competitive injury requirement in primary-line price discrimination cases, the *Morton Salt* inference has continuing vitality in claims of secondary-line injury.

**10.** The Carriers' Second cause of action also implicitly contains allegations of discriminatory advertising allowances in violation of §§ 2(d) and (e) of the Clayton Act. (*See* Compl. ¶¶ 46(c), 56–57). Because the requisite elements of §§ 2(d) and (e) claims substantially overlap with the elements of a secondary-line price discrimination, the above analysis applies to all three of the Carriers' claims in their Second cause of action. *See* Von Kalinowski, *supra*, § 5.10[2], at 5–123. In any event, the Daily News's Motion does not address discriminatory advertising allowances, and therefore, the Carriers' claims under §§ 2(a), (d) and (e) survive dismissal.

Although the Carriers' Second cause of action survives dismissal, the Court so rules because on this motion, it is bound to accept the Carriers' well-pleaded allegations as true, and must draw all reasonable inferences in their favor. The complaint contains the bare minimum necessary for the Carriers to proceed on their Second cause of action. In short, the Carriers have a burden of supporting alleged facts, which are all fiercely contested, to substantiate their claims.

## VI. CONSPIRACY TO FIX PRICES AND THE MONOPOLIZATION CLAIMS

The Carriers' Third and Fourth causes of action articulate various claims under the Sherman Act, 15 U.S.C. §§ 1 & 2 (1997). In their Third cause of action, the Carriers allege that the Daily News conspired with others to force "the Plaintiffs to purchase the News from the Defendant/Publisher at unreasonably high prices," amounting to a "systematic exclusion" of the Carriers from the home delivery business. (Compl.¶¶ 71, 72). In essence, the Carriers' Third claim amounts to a garden-variety action asserting a conspiracy to fix prices and to exclude competitors under § 1 of the Sherman Act. The Carriers' Fourth cause of action, misleadingly titled "Further Conspiracy in restraint of trade," consists of three claims alleging violations of § 2 of the Sherman Act: that the Daily News (1) monopolized the market for the Newspaper; (2) attempted to monopolize that market; and (3) conspired with others to monopolize that market.

Both the Third and Fourth causes of action falter because they fail to meet two indispensable prerequisites applicable to any private plaintiff seeking relief for a violation of § 1 or § 2 of the Sherman Act: the requirements of pleading antitrust injury and a relevant market. In addition, with respect to their conspiracy claims, the Carriers have failed to allege specific facts sufficient to aver a conspiracy.

### A. ANTITRUST INJURY

Private plaintiffs in antitrust cases do not literally sue under the Sherman Act. Rather, §§ 4 and 15 of the Clayton Act provide separate statutory vehicles empowering private plaintiffs to seek treble damages and injunctive relief for violations of the Sherman Act. *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529–30, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 185 (S.D.N.Y.2000) ("[s]ection 4 of the Clayton Act allows private enforcement of the antitrust laws and broadly defines the class of persons who may maintain a private damage action.").

In so doing, § 4 imposes a requirement of establishing antitrust injury in order to have "standing." [11] *See Associated Gen.*, 459 U.S. at 534 n. 31, 103 S.Ct. 897;

---

11. In *Associated Gen.*, 459 U.S. at 534 & n. 31, 103 S.Ct. 897, the Supreme Court identified additional factors for lower courts to consider in determining whether a particular plaintiff has standing to bring suit under the antitrust laws. Those factors include: (1) the causal connection between an antitrust violation and the alleged harm suffered by the plaintiff; (2) the nature of the plaintiff's antitrust injury; (3) the directness or remoteness of the asserted injury; (4) the existence of more direct and identifiable victims of the antitrust violation, other than the plaintiff; and (5) the potential for duplicative recovery or complex apportionment of damages. *See also In re Nine West Shoes*, 80 F.Supp.2d at 186. Because this Court holds that the Carriers have failed to sufficiently allege antitrust injury at all, a comprehensive analysis of standing under the *Associated Gen.* factors is unnecessary.

478

*George Haug*, 148 F.3d at 139 ("[a] private plaintiff seeking to state a claim for a violation of sections 1 or 2 of the Sherman Act must allege that it has suffered 'antitrust injury.'") (citations omitted); *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) ("[i]t is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury."); *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F.Supp.2d 275, 297–98 (S.D.N.Y.1998) (" '[n]o violation of Section 1 of the Sherman Act is possible absent proof of anticompetitive effect beyond the injury to plaintiffs, and facts must be pleaded from which such acts can be inferred.'") (citations omitted); *Volmar Distrib. v. New York Post Co., Inc.*, 825 F.Supp. 1153, 1159 (S.D.N.Y. 1993) ("to recover under the Clayton Act private plaintiffs must demonstrate that the injuries they suffered were caused by acts that had a competition-reducing effect.").

As the cases above underscore, the antitrust injury requirement exists independently of the elements of an antitrust violation and becomes itself a pleading requirement. *See In re Nine West Shoes*, 80 F.Supp.2d at 186 ("[t]his standard does not arise from the text of the Sherman Act; rather, it is separately imposed by Sections 4 and 16 of the Clayton Act, which confer antitrust standing on private plaintiffs."); *see also Granite Partners*, 17 F.Supp.2d at 297–98. Furthermore, antitrust injury is a term of art, which does not contemplate every conceivable type of harm that occurs in the marketplace, but rather injury resulting from conduct specifically condemned by the Sherman Act. As the Supreme Court noted: "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows

from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (emphasis in original).

It is well-established that a primary goal of the antitrust laws is the protection of consumers. *See In re Nine West Shoes*, 80 F.Supp.2d at 187. Thus, the prototypical example of antitrust injury is an allegation by consumers that they have had to pay higher prices (or experienced a reduction in the quality of service) as a result of a defendant's anticompetitive conduct. *See Associated Gen.*, 459 U.S. at 538, 103 S.Ct. 897; *see also In re Nine West Shoes*, 80 F.Supp.2d at 187 ("[t]he Supreme Court has stated that consumers may suffer a particular kind of antitrust injury ... when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of.") (citations omitted). Courts in this District have also said that antitrust injury may be established by showing that a plaintiff's "loss comes from acts that reduce output ...." *Volmar*, 825 F.Supp. at 1160 (citations omitted).

The precise contours of antitrust injury are indeed blurry. What an assessment of alleged injury here requires, however, is a rigorous examination of the Carriers' claims in light of certain principles that courts have articulated to guide the inquiry: the harm must result from a competition-reducing aspect or effect of defendant's behavior, and it must flow from conduct that the antitrust laws clearly condemn. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690.

In the present case, all of the Carriers' allegations of injury amount to one basic proposition—that the Carriers themselves

were injured either by the Daily News's alleged exclusionary conduct or by limitations placed on their freedom to conduct business as they saw fit. Specifically, Carriers contend that:

- The Daily News attempted to eliminate competition between itself and the Carriers. (Compl.¶ 53).

- The Daily News induced the Carriers' customers to transfer business to the Daily News. (Compl.¶ 54).

- The Daily News limited the Carriers' access to and supply of the Newspaper. (Compl.¶ 69).

- The Daily News systematically excluded the Carriers from the home delivery market. (Compl.¶¶ 71, 76).

- The Carriers were precluded from competing effectively. (Compl.¶ 166).

- The Carriers lost sales and profits. (Compl.¶ 167).

The critical issue then is whether these varied assertions constitute the type of antitrust injury necessary to state a claim for relief. Several courts, confronted with similar factual pleadings, have held that allegations of injury to competitors alone, no matter how numerous or conclusory, are insufficient to state antitrust injury. *See George Haug,* 148 F.3d at 139–40; *Balaklaw,* 14 F.3d at 801; *Volmar,* 825 F.Supp. at 1160. Because the antitrust laws are designed to protect competition, and not competitors, private antitrust plaintiffs must allege harm to competition in the market rather than primarily harm to themselves. *See Brunswick,* 429 U.S. at 488, 97 S.Ct. 690.

In *Granite Partners,* 17 F.Supp.2d at 297, plaintiffs alleged that brokers conspired to supply " 'collusive, rigged, and lowball accommodation bids that were designed . . . to create the false appearance of competitive bidding for the Funds' securities in the liquidation auctions . . . and to provide a false pricing background for deemed sales.' " The court held that these allegations were insufficient to state a cause of action because the plaintiffs failed to

> allege that the conduct of the brokers had any economic impact on the CMO market at large or any prejudice to the public interest. Nor does it articulate how the alleged conspiracy during the last week of March 1994 had the effect of substantially lessening competition in the relevant market. Moreover, the Complaint does not state that the Brokers' actions resulted in a lack of reasonable alternative sources for buyers and sellers of CMOs. In short, the LAB fails to adequately allege that anyone other than the Funds themselves was injured. This pleading failure is fatal to the LAB's Sherman Act cause of action.

*Id.*

In *Volmar,* 825 F.Supp. at 1158, plaintiffs were independent, non-unionized newspaper distributors in the New York metropolitan area, performing a resale and delivery function similar to that of the Carriers in the present case. The only factually supportable allegation of injury was that plaintiffs had been excluded from the market by defendants' conduct. The court held that this allegation failed to state a claim of injury and dismissed the claim, noting that the allegation merely "describe[s] the challenged conduct's effect only on plaintiffs, who are defendants' competitors, not its effect on the competitive market structure." *Id.* at 1160.

Despite the Carriers' varied and conclusory assertions of antitrust injury in this case, the Court finds that the harms they claim do not extend beyond injury to themselves. That is not to say that this finding should be construed as minimizing, in any way, the Carriers' complaint of harm to their businesses. By definition,

however, fair and vigorous competition necessarily entails success for some and loss or only marginal profit for others—a natural result which never sits well with all of the parties who sacrifice and risk equally to compete in the marketplace. But the antitrust laws require competitors to show more than individual loss or exclusion resulting from fair and vigorous competition. Here, the Carriers fail to allege any facts that point to a demonstrable impact on the market. Therefore, because of their failure to plead antitrust injury, the Carriers' Third and Fourth causes of action are dismissed.

The Court also notes that the Carriers have attempted to revisit their allegations of antitrust injury in their Memorandum of Law in Opposition to Defendant Daily News' Motion to Dismiss, dated July 20, 2000 (hereinafter, "Carriers' Memorandum"). For the first time, the Carriers' Memorandum raises the issue of harm to consumers. (*See id.* at 14–16). Specifically, the Carriers claim that as a result of the Daily News's exclusionary conduct, they are being prevented from providing customers with the high quality service that they would normally provide. (*Id.* at 15–16). Without passing on the merits of these alleged injuries to consumers, the Court, in connection with a 12(b)(6) motion, is limited to a thorough review of (1) the complaint; (2) any documents appended to the complaint; (3) documents clearly incorporated in the complaint by reference; and (4) any facts of which the court can take judicial notice. *See Global Discount Travel,* 960 F.Supp. at 704 (citations omitted). Therefore, the Court is not at liberty to look beyond this limited universe of factual allegations in ruling on a motion to dismiss, and any consideration of the Carriers' Reply Memorandum would be inappropriate. *See Fort Wayne Telsat v. Entertainment and Sports Programming Network,* 753 F.Supp. 109, 113 n. 4

(S.D.N.Y.1990) ("[i]t is a basic principle that a complaint may not be amended by the plaintiff's brief filed in opposition to a motion to dismiss."). Consequently, the insufficiencies in the Carriers' pleadings are not rectified by the allegations set forth in their Memorandum and their Sherman Act claims are dismissed.

## B. *RELEVANT MARKET*

Alternatively, the Carriers' Third and Fourth causes of action may be dismissed on the grounds of failure to allege a viable relevant market. The requirement of pleading a relevant market is closely intertwined with the element of antitrust injury, or harm to competition in the market. Simply put, the latter is not possible without the former. *See generally, United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,* 909 F.Supp. 162, 172 (S.D.N.Y.1995). In other words, "[a] complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Global Discount Travel,* 960 F.Supp. at 704 (citations omitted). Therefore, in *Global Travel,* the court held that any claim under § 1 or § 2 of the Sherman Act must allege a viable relevant market in order to survive a motion to dismiss. *See id.* at 704–05.

The concept of "relevant market" has two components: a relevant product market and a relevant geographic market. *See, e.g., Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) ("[d]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."). The product market inquiry focuses on the range of products that

actually compete in the disputed market, and that inquiry turns on the concepts of reasonable interchangeability and cross-elasticity of demand. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *du Pont*, 351 U.S. at 395, 76 S.Ct. 994. The geographic market analysis seeks to identify the precise geographic boundaries of effective competition in order to reach a more informed conclusion on potential harm to the market. *See, e.g., Discon Inc. v. NYNEX Corp.*, 86 F.Supp.2d 154, 160 (W.D.N.Y.2000) ("[t]he relevant geographic market encompasses the geographic area where competition occurs.").

Taken together, the product and geographic components illuminate the relevant market analysis, which is essential for assessing the potential harm to competition from defendants' alleged misconduct. Therefore, courts have held that without a proper delineation of both the product and geographic markets, a claim under § 1 or § 2 of the Sherman Act will be dismissed. *See NYNEX*, 86 F.Supp.2d at 160 ("in order to survive dismissal, a plaintiff asserting claims under §§ 1 and 2 of the Sherman Act 'must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized.'") (citations omitted).

### 1. *The Relevant Product Market*

■ The seminal case in relevant market analysis is *du Pont*, 351 U.S. at 395, 76 S.Ct. 994. The Supreme Court there stated that, "[i]n considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." *Id.* Any viable relevant market, therefore, must take into account any reasonably interchangeable substitutes for the product in question. In fact, sufficient allegation of the relevant product market with reference to the rule of interchangeability is necessary to state a claim for relief. *See Global Travel*, 960 F.Supp. at 705 ("[p]laintiff's failure to define its market by reference to the rule of interchangeability is, standing alone, valid grounds for dismissal."); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162, 171–72 (S.D.N.Y.1995); *Ford Piano Supply Co. v. Steinway & Sons*, No. 85 Civ. 1284, 1988 WL 3488, at *2 (S.D.N.Y. Jan. 13, 1988).

Determining the proper contours of a relevant market also involves an examination of the closely-related concept of cross-elasticity of demand. *See du Pont*, 351 U.S. at 394, 76 S.Ct. 994. Cross-elasticity of demand measures the change in demand for a product given a change in price for a related product. *See Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698. A product will likely experience a change in demand if there is a slight increase or decrease in the price of another product that is reasonably interchangeable. *See id.* ("[i]n case of a product it may be of such a character that substitute products must also be considered, as customers may turn to them if there is a slight increase in the price of the main product.").

It is clear from the face of the complaint that the Carriers have failed to allege a viable product market. The Carriers claim that "[a]t all times material herein, the relevant 'market' is defined as the home delivery subscriptions of the [Daily] News." (Compl.¶ 47). The first fatal flaw in this market definition is that it does not even reference the rule of reasonable interchangeability. There is no discussion of other products in the market that potentially compete with the Daily News, of arguably competing products that should

not be included the market, or of the factors that make the Daily News a unique market. This failure to reference the rule of interchangeability is alone grounds for dismissal. *See Global Travel,* 960 F.Supp. at 705.

In fact, the Carriers attempt to define a relevant market in terms of a single brand name product, the Daily News. In articulating the rule of reasonable interchangeability, the Supreme Court in *du Pont* cast serious doubt on single brand markets:

> one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*du Pont,* 351 U.S. at 393, 76 S.Ct. 994. Given these doubts, courts have consistently held that a brand name product cannot define a relevant market.

In *Global Travel,* 960 F.Supp. at 705, plaintiff attempted to define the relevant market as tickets for travel on TWA between certain city pairs, citing distinguishing features of TWA tickets such as flight times, dates, and mileage. The court dismissed this narrow market formulation:

> The plaintiff's argument is analogous to a contention that a consumer is "locked into" Pepsi because she prefers the taste, or NBC because she prefers "Friends," "Seinfeld," or "E.R." A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base,

Pepsi is one of many sodas, and NBC is just another television network.

*Id.*

Several cases in this Circuit confirm the difficulty in delineating a relevant market based on artificially narrow boundaries or a single brand name product. *See Belfiore v. New York Times Co.,* 826 F.2d 177 (2d Cir.1987) ("general interest daily newspapers directed primarily to upscale readers," as a market definition trying to isolate *The New York Times,* was implausible as theoretical matter), *cert. denied,* 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988); *Shaw v. Rolex Watch, U.S.A., Inc.,* 673 F.Supp. 674, 678–79 (S.D.N.Y.1987)(market for Rolex watches cannot support claim under § 2); *H.L. Moore Drug Exchange v. Eli Lilly & Co.,* No. 76 Civ. 2817, 1978 WL 1347, *2 (S.D.N.Y.1978)(market for patented Lilly pharmaceuticals which have no competitive or generic equivalent in the industry fails to set forth legally relevant market).

The Carriers make a weak attempt to justify their artificially constricted market definition in their Memorandum. They assert that the Newspaper is a unique product because, *inter alia,* (1) *The New York Times* is a full sheet paper with color; (2) the *Daily News* has unique local features and exclusive writers; and (3) other papers such as *The Wall Street Journal* and the *New York Law Journal* are strictly geared toward professionals. (*See* Carriers' Memorandum at 28). Even if these distinctions had been alleged in the complaint, they are virtually meaningless in a reasonable interchangeability analysis. Reasonable interchangeability fully acknowledges differences in product characteristics, reflecting commercial realities.

There is no dispute that the *The New York Times,* the *New York Post, The Wall Street Journal* and the *Daily News* differ and even compete in material ways. The

essential inquiry, however, is whether the *Daily News* is a functional substitute for other newspapers. Some consumers may prefer the *Daily News* for any number of reasons. But at a basic level, the *Daily News* is a newspaper, functionally interchangeable with many others, that competes in a market for readers of the news. The Court cannot see the utility of further expending the limited resources of the parties and the judiciary to rediscover that simple concept.

The Carriers' attempt to establish a "sub-market" by referencing the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), also fails. *Eastman Kodak* created a limited exception for a market based on a single brand name when, as a result of an expensive investment in a primary market, the purchaser is locked into an aftermarket of the brand name manufacturer's products. *See id.* at 476, 481–82, 112 S.Ct. 2072 (where purchaser of a high-priced Kodak copier was effectively locked into the aftermarket for Kodak copier parts and services). A disposable newspaper cannot be equated to a complex, costly machine that in any business may be one of a kind and thus requires constant maintenance and replacement of parts. Moreover, at the going rate for a copy of a newspaper, purchasers are hardly locked into future purchases of the *Daily News.*

The Carriers' failure to define a viable product market with reference to the rule of reasonable interchangeability is alone grounds for dismissal of their Third and Fourth causes of action.

**2. *The Relevant Geographic Market***

In addition, the Carriers' failure to define a viable product market is exacerbated by their vague delineation of the relevant geographic market. The Carriers'

only allegations that resemble a geographic market discussion are contradictory. At times, the Carriers appear to advance a narrow, "tri-state area" market. (Compl.¶ 48). On the other hand, the Carriers' descriptions of the Daily News's operations indicate a broader national market: "Publisher is further engaged in selling and distributing its publication in interstate commerce to readers or other purchasers throughout the United States." (Compl.¶ 39). If, in fact, they intended to define a tri-state area market, the Carriers have not provided any facts to support the conclusion that the effective area of competition should be drawn so narrowly. The Carriers' failure to define a geographic market with precision makes it impossible to assess the potential harm to competition resulting from the Daily News's alleged misconduct. *See NYNEX,* 86 F.Supp.2d at 160.

In short, the Carriers have failed to allege both essential components of a viable relevant market. Their proffered product market is artificially based on a single brand name product—the *Daily News*—and there is no clear indication from the complaint as to a precise geographic market. Therefore, the Sherman Act claims in the Carriers' Third and Fourth causes of action are dismissed.

**C. *OVERT ACTS IN A CONSPIRACY***

In the Third and Fourth causes of action, the Carriers also allege that the Daily News and others were involved in at least two distinct conspiracies, a conspiracy to raise the Carriers' prices and to exclude them from the market for home delivery of the Newspaper in violation of § 1 of the Sherman Act (Third cause of action) and a conspiracy to monopolize under § 2 of the Sherman Act (Fourth cause of action). Both conspiracies require alleging facts with specificity in order to survive a mo-

tion to dismiss. *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 70 (2d Cir.1988) ("[a]n agreement between two or more persons is fundamental to any § 1 claim."); *Fort Wayne Telsat v. Entertainment and Sports Programming Network,* 753 F.Supp. 109, 115 (S.D.N.Y.1990).

 In general, the elements of a conspiracy to monopolize claim are (1) proof of concerted action, deliberately entered into with the specific intent to achieve unlawful monopoly power; and (2) the commission of an overt act in furtherance of the conspiracy. *See Int'l Distrib. Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 795–96 (2d Cir.1987) (citations omitted). To state a claim for relief under § 1 of the Sherman Act, the Carriers must allege that (1) defendants entered into a contract, combination or conspiracy and (2) the conspiracy worked in restraint of trade or commerce among the several states. *See Fort Wayne Telsat,* 753 F.Supp. at 115. Under either claim, the Carriers must do more than merely allege the existence of a conspiracy. *See id.* They must provide some factual support for the allegation of a conspiracy. *See id.* In the case of a conspiracy to monopolize, claimants must show at least one overt act aimed at accomplishing its anticompetitive objective. *See Walsh Trucking,* 812 F.2d at 795–96.

 In the present case, the Carriers have not alleged anymore than that conspiracies existed. The Carriers recite a laundry list of actions taken by the Daily News, which the Carriers believe were designed to drive them out of the market. These actions include: (1) changing delivery methods and schedules; (2) instituting a new computer-based customer tracking system; and (3) adopting a centralized customer complaint system.[12]

However true these allegations may be, they neither aver nor substantiate conspiratorial activity. The Court is left with no information as to the identities of the co-conspirators, the nature of their conspiracy, how the participants attempted to accomplish their objectives, and what overt acts, if any, they performed towards the fulfillment of their conspiracy. More importantly, all of the allegations describe unilateral conduct on the part of the Daily News, designed to vertically integrate the functions of publication and delivery. Courts have held that such vertical integration, even by a monopolist, does not offend the Sherman Act, absent proof of intent to harm competition and of specific acts in furtherance of the alleged conspiracy. *See Belfiore v. New York Times Co.,* 654 F.Supp. 842, 847, 851 (D.Conn.1986), *aff'd,* 826 F.2d 177 (2d. Cir.1987).

In short, the Carriers hope to proceed on the naked assertion that conspiracies existed. Without more to support the allegations, the Court is compelled to dismiss these conspiracy claims. *See Fort Wayne Telsat,* 753 F.Supp. at 115 (citing *Int'l Television Prods. Ltd. v. Twentieth Century–Fox Television Div. of Twentieth Century–Fox Film Corp.,* 622 F.Supp. 1532, 1537 (S.D.N.Y.1985) ("[t]he complaint must identify the co-conspirators, and describe the nature and effects of the alleged conspiracy.")); *Belfiore,* 654 F.Supp. at 851–53.

The Carriers have not only failed to plead antitrust injury and a relevant market, but also neglected to show any overt acts or factual bases for a conspiracy under Sections 1 or 2 of the Sherman Act. Therefore, the Carriers' Third and Fourth

12. *See* discussion *supra,* Part II.

causes of action are dismissed in their entirety.

## VII. *MAXIMUM RESALE PRICE MAINTENANCE*

■ The Carriers' Twelfth cause of action contains lengthy factual allegations, most of which are unrelated to an antitrust claim. Embedded within the narrative, however, are traces of a claim for maximum resale price maintenance in violation of § 1 of the Sherman Act. (Compl.¶ 164(D)). In essence, the Carriers contend that the Daily News set the price which they charged to customers; that the Carriers were prohibited from charging more; and that their inability to charge more than the Daily News's fixed price resulted in injury to the Carriers.

The Daily News relies heavily on the Supreme Court's decision in *State Oil v. Khan,* 522 U.S. 3, 16, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997), in support of its motion to dismiss. The Court in *Khan,* overruling its prior ruling in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), held that maximum resale price maintenance agreements are not *per se* unlawful under the Sherman Act. *See Khan,* 522 U.S. at 16, 118 S.Ct. 275. The decision should not be mistaken for the proposition that maximum resale price maintenance schemes are presumptively lawful. *See id.* at 22, 118 S.Ct. 275. The Court merely established that these agreements should be analyzed under the rule of reason, an inquiry which hinges on "a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id.* at 10, 118 S.Ct. 275 (citations omitted). Therefore, reliance on *Khan* by itself does not justify dismissal of the Carriers' complaint.

The Carriers, on the other hand, cite *Caribe BMW v. Bayerische Motoren Werke Aktiengesellschaft,* 19 F.3d 745, 753 (1st Cir.1994), to support their maximum resale price maintenance claim. In *Caribe BMW,* the plaintiff, an independent BMW dealer, brought an action against the German auto manufacturer and its exclusive U.S. distributor for imposing maximum resale prices. *See id.* at 752. Plaintiff alleged that, as a result of this illegal pricing arrangement, it lost profits. *See id.* Because the plaintiff was the very firm which the resale price arrangement targeted and because it suffered by not being able to charge more and thereby losing profits, the court held that plaintiff had alleged antitrust injury sufficient to confer standing. *See id.* at 753.

In the present case, the Carriers contend that they are part of a group of competitors that was forced into complying with the Daily News's maximum price arrangement. As a result of its compliance, the Carriers claim they suffered lost profits. Arguably, under the reasoning of *Caribe BMW,* the Carriers' allegations may satisfy the requirement of showing antitrust injury.

Nevertheless, the Carriers are not relieved from pleading a viable relevant market in which to assess the alleged competitive harm. As the case law unequivocally explains, a viable relevant market is indispensable for a cause of action under either § 1 or §.2 of the Sherman Act. *See Global Discount Travel,* 960 F.Supp. at 704 ("to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized."); *see also Gianna Enter. v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1353 (S.D.N.Y.1982) ("[t]o state an antitrust claim, plaintiff must show that defendant acted to restrain

competition. To do so, plaintiff must first identify the relevant product market and the alleged restraint.").

The relevant market requirement is all the more important in light of the Supreme Court's decision in *Khan.* It is axiomatic that a central focus of the rule of reason is the relevant market and what effects, if any, the alleged anticompetitive conduct had, or will have, in that market. *See Double D Spotting Serv., Inc. v. Supervalu, Inc.,* 136 F.3d 554, 558 (8th Cir. 1998) ("[m]ost antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition ... [which] involves an inquiry into the market structure and the defendant's market power in order to assess the actual effect of the restraint."); *United States v. Brown Univ.,* 5 F.3d 658, 668 (3d Cir.1993) ("[t]he plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets."); *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York,* 40 F.Supp.2d 109, 117 (E.D.N.Y.1999) ("[u]nder the rule of reason, a plaintiff who alleges an antitrust violation bears the burden of establishing 'that the challenged action has had an actual adverse effect on competition as a whole in the relevant market.' "). Therefore, by holding that all maximum resale price maintenance claims should be judged under the rule of reason, *Khan* elevates the relevant market analysis to a linchpin inquiry in such claims.

In addition, the rationale behind the Supreme Court's decision to overrule *Albrecht* is instructive here. *Khan* represented the culmination of a steadily evolving reconsideration of vertical restraints. *See Khan,* 522 U.S. at 10–15, 118 S.Ct. 275. This reconsideration was based in part on the recognition that vertical restraints may have substantial pro-competitive inter-brand effects. *See id.* at 14–15, 118 S.Ct. 275. At a basic level, maximum resale price maintenance may be consumer-friendly, as the practice evidences a manufacturer's desire to keep prices below a stated point and closer to competitive levels. *See id.* at 15, 118 S.Ct. 275. Given these potentially pro-competitive consequences of maximum resale price maintenance, it follows that plaintiffs should be put to the task of demonstrating that the alleged restraint has identifiable anticompetitive effects in a relevant market.

As already noted, the Carriers fail to advance a legally viable market.[13] Any market based on the sale or delivery of one newspaper fails to take into account cross-elasticity of demand, reasonable interchangeability, and substitutable products. Thus, the Carriers' proffered market makes it impossible to weigh the effects of the Daily News's alleged conduct. Given their failure to state a viable relevant market, the Carriers' Twelfth cause of action is also dismissed.

## VIII. *THE INDIVIDUAL DEFENDANTS' MOTION*

Wilbert Delisme, Pierreson News, Inc., Chi Hung Chan, Chun Wok Au, Chan & Au, Inc., Kimberly Hancock and Top O' The Mornin Delivery Service, Inc., other purported Individual Defendants in this action, have moved to dismiss the complaint for insufficient process and defective service under Rules 12(b)(4) and (b)(5) of the Federal Rules of Civil Procedure. The

---

**13.** *See* discussion *supra,* Part VI.B.

Carriers may be correct to note that they were unaware of the identities of the Individual Defendants at the commencement of this action, but they knew the identities of each of the seven particular Individual Defendants herein prior to the time of service. (*See* Affirmation of Andrew J. Campanelli, sworn to Oct. 20, 2000, ¶ 9).

While some of the defects described by these seven Individual Defendants may be minor or technical errors, the cumulative nature of these deficiencies, coupled with the Carriers' knowledge, convinces the Court that dismissal is appropriate. Accordingly, upon the filing and service of any amended complaint, the Carriers are directed to:

1. Obtain a summons, pursuant to Rules 4(a) and (b) of the Federal Rules of Civil Procedure, that is directed to and issued for each Individual Defendant and that bears each Individual Defendant's name and address;

2. Revise the caption on the summons, amended complaint and Rule 1.9 Statement to name each of the Individual Defendants;

3. Revise the allegations of the amended complaint to name any and/or all of the Individual Defendants within the body of the amended pleading, including, but not limited to, stating clearly and concisely any claims against each Individual Defendant and identifying specific acts and/or omissions for which any or all of the Individual Defendants could be held liable so that each Individual Defendant may answer, move or otherwise respond to allegations relevant to that defendant; and

4. File proofs of service, in accordance with rule 4(1) of the Federal Rules of Civil Procedure, with the Clerk of the Court as to each of the Individual Defendants.

## IX. *CONCLUSION AND ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that defendant Daily News's Motion to dismiss the complaint herein is granted as to the plaintiffs' First, Third, Fourth, and Twelfth causes of action, with leave for plaintiffs to file an amended complaint; and it is further

**ORDERED** that defendant Daily News's Motion to dismiss is denied as to plaintiffs' Second cause of action; and it is further

**ORDERED** that the Individual Defendants' Motion is granted, with leave for plaintiffs to file an amended complaint consistent with this Decision and Order; and it is finally hereby

**ORDERED** that the Court shall retain supplemental jurisdiction of the remaining claims brought against defendant Daily News pursuant to state law.

If they so choose, plaintiffs may file an amended complaint within twenty (20) days of the date of this Decision and Order.

**SO ORDERED.**