**Andre NICHOLS and Daniel Moraes, Plaintiff**

v.

**Michael T. MAHONEY, EMC Contracting Inc., EMC New York Contracting, and EMC of New York, Inc., Defendants.**

No. 08 Civ. 3306(CM)(DCF).

United States District Court, S.D. New York.

April 2, 2009.

Gary Silverman, Joy Kim Mele, O'Dwyer And Bernstein, L.L.P., New York, NY, for plaintiffs.

George L. Santangelo, New York, NY, for defendants.

DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AND GRANTING PLAINTIFFS' CROSS MOTION FOR LEAVE TO AMEND

McMAHON, District Judge.

Defendants move to dismiss plaintiffs' complaint. Plaintiffs oppose the motion, and cross-move for leave to amend, attaching a proposed amended complaint.

An order disposing of these motions issued on March 31. Plaintiffs' motion for leave to amend was granted. However, because both their original and amended pleadings failed to state claims under the civil RICO statute or antitrust laws, defendants' motion to dismiss Counts I, II and III (RICO Claims), IV (violation of the Sherman Act, 15 U.S.C. § 1) and V (violation of the Donnelly Act, N.Y. Gen. Law. § 340 *et seq.*) of the plaintiffs' complaint was granted and the claims were dismissed with prejudice. Defendants' motion to dismiss Counts VI (violation of the Fair Labor Standards Act) and Count VII (violation of New York Labor Law) was denied.

This opinion explains the reasons for the court's ruling.

### The Gravamen of this Action

This is the latest in a series of civil RICO actions that have been filed in various federal courts across the nation, capitalizing on the popular outcry against undocumented aliens who are working openly in the United States. Plaintiffs, Andrew Nichols and Daniel Moraes, are construction workers who were formerly employed by the defendant corporations and their owner, Michael T. Mahoney. They allege that their wages were depressed because the defendants knowingly hired undocumented aliens, in violation of Section 274 of the Immigration and Nationality Act, 8 U.S.C. § 1324(a). Plaintiffs also contend that defendants' actions constituted an illegal "scheme" to restrain free competition within the construction industry, by giving defendants an unfair advantage over employers who do not employ illegal workers.

Plaintiffs also allege that they were not properly compensated for overtime hours worked or paid minimum wage, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* and New York Labor Law §§ 190 *et seq.*, 650 *et seq.*

### Discussion

### I. Standard of Review

#### A. Motion to Dismiss

Rule 12(b) (6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." *Frasier v. Gen. Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991). The court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ——, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quotations, citations and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007). *cert. granted,* —— U.S. ——, 128 S.Ct. 2931, 171 L.Ed.2d 863 (2008).

### B. Leave to Amend

In assessing whether a proposed amendment to a complaint is futile, a court uses the standard for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Esposito v. Deutsche Bank AG,* 07 civ. 6722, 2008 WL 5233590 at *3 (S.D.N.Y. Dec.16, 2008) (*citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d. Cir.2002)). The court has granted plaintiffs' leave to amend and will evaluate both the original and the proposed amended complaints in this decision.

### II. Plaintiff Fails to State Any Viable Civil RICO Claim

Pursuant to 18 U.S.C. § 1964(c), the plaintiffs allege violations under sections 1962(c) and (d) (RICO conspiracy) of the RICO statute.

To establish a RICO violation under section 1962(c), a plaintiff must allege and prove four elements: " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' These requirements apply whether the RICO claim is civil or criminal in nature." *City of New York v. Smokes–Spirits.Com, Inc.,* 541 F.3d 425, 439 (2d Cir.2008) (*quoting Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

In addition, a civil RICO claimant must show: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir.2008) (quotation and citation omitted).

Defendants contend that the plaintiffs fail to plead sufficiently (1) the existence of an enterprise; (2) a substantive violation of section 1962; and (3) proximate cause. Plaintiffs' original complaint does not adequately plead a substantive violation (predicate act). They try to cure that defect in two different ways in their amended complaint; one way works, and one does not. However, the amended pleading fails to plead proximate cause between the predicate acts and plaintiffs' injury. Therefore, the RICO claims must be dismissed.

### A. Both the Original Complaint and The Proposed Amended Complaint Adequately Plead Conduct of An "Enterprise"

Section 1962(c) of the RICO statute makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c). To plead a RICO violation, a plaintiff "must allege . . . . the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161–62, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001): *Smokes–Spirits,* 541

F.3d at 446. Section 1961(3) defines a person as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Smokes–Spirits*, 541 F.3d at 447; *Kottler v. Deutsche Bank AG*, 607 F.Supp. 2d 447, 458, 2009 WL 55885, at *5 (S.D.N.Y.2009).

■ The enterprise requirement is most easily satisfied "when the enterprise is a formal legal entity." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir.2004). However, an association-in-fact may also be a RICO enterprise. *Id.*

■ In this case, the plaintiffs allege the existence of both a formal legal entity enterprise (Count I) and an association-in-fact enterprise (Count II). The defendants contend that neither enterprise pleading satisfies the requirements of RICO. They are wrong on both accounts.

In Count I, the plaintiffs allege that Mahoney, the principal of the EMC entities, is the "person," and that the EMC entities are the enterprise. These allegations are sufficient to plead the existence of two distinct entities. *Cedric Kushner*, 533 U.S. at 166, 121 S.Ct. 2087. In *Cedric Kushner*, the Supreme Court reversed and remanded the Second Circuit's decision affirming the dismissal of the plaintiff's complaint. The plaintiff sued Don King, the president and sole shareholder of Don King Productions, alleging violations of the RICO statute. The district court dismissed the complaint because it found that King was not a "person" who was distinct from "the enterprise," but rather was part of the enterprise. For many years, it was the law in this Circuit that a corporation and its employees could not constitute an

"enterprise." However, in an unanimous decision, the Supreme Court undid that precedent, holding, "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." *Id.* at 163, 121 S.Ct. 2087.

The allegations of Count I meet the distinctness requirement, because Mahoney—a natural person—is distinct from EMC—the enterprise—even though he is also the principal of the EMC entities. The defendants' argument otherwise is based on a misreading of the plaintiffs' complaint. Defendants mistakenly assert that the plaintiffs' complaint alleged, "EMC is the enterprise and the corporate entity conducting the affairs of the enterprise" (i.e., the person). (Def. Mem. at 14.) However, the complaint actually says, "At all times relevant to this action, defendant Mahoney was a 'person' as defined in 18 U.S.C. § 1961(3). Defendants EMC constitute the enterprise as defined in 18 U.S.C. § 1961(4)." (Compl. ¶¶ 90–91; Am. Compl. ¶¶ 114–15.)

In Count II, the plaintiffs allege that the defendants are part of an enterprise composed of entities associated-in-fact, which consists of the EMC entities, Mahoney, and American Latin. They allege that, under the direction of EMC and Mahoney, the association-in-fact worked together to obtain "illegal workers for employment by EMC." (Compl. ¶ 69; Am. Compl. ¶ 92.) By doing so, all three hoped to make large sums of money—EMC and Mahoney by depressing wages, and American Latin by receiving a fee for each worker it provided EMC. (*See* Compl. ¶¶ 70–71; Am. Compl. ¶¶ 93–94.)

■ An association-in-fact theory is "a group of persons associated together for a common purpose of engaging in a course

of conduct.... [which is] proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). "Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure. Thus, ... proof of various racketeering acts may be relied on to establish the existence of the charged enterprise." *United States v. Coonan*, 938 F.2d 1553, 1559–60 (2d Cir.1991). "While the question of whether a group of individuals or corporations exhibit such organization and common purpose is ordinarily one of fact, the complaint must allege facts that permit an inference that such an association exists." *Zito v. Leasecomm Corp.*, 02 Civ. 8074, 2004 WL 2211650, at *7 (S.D.N.Y. Sept.30, 2004).

In addition, the distinctness requirement of RICO helps a court determine whether an association-in-fact exists:

> In practice, the dual requirements of (1) distinctness and (2) the proof needed to demonstrate an association-in-fact, work in tandem to weed out claims dressed up as RICO violations but which are not in fact. Specifically, the distinctness doctrine requires a plaintiff to demonstrate that the RICO person is legally separate from the RICO enterprise, while the association-in-fact requirement helps ensure that distinctness is not achieved by simply tacking on entities to the enterprise which do not in fact operate as a "continuing unit" or share a "common purpose."

*Smokes–Spirits*, 541 F.3d at 447.

Defendants contend that plaintiffs' associate-in-fact theory in Count II is deficient. They cite *Baker v. IBP. Inc.*, 357 F.3d 685, 691 (7th Cir.2004), in support of their argument.

In *Baker*, the plaintiffs argued that defendant violated section 274(a)(3), and derivatively RICO, by bringing in and employing illegal aliens "for financial gain (a reduction in the wages it must pay)...." *Id.* at 687. The plaintiffs alleged that the enterprise—based on an association-in-fact theory—consisted of the defendant plus "the persons and organization who help it find aliens to hire." *Id.* at 691. The plaintiffs' RICO complaint was dismissed because the plaintiffs failed to allege a distinction between the defendant and the enterprise. *Id.* at 692. The Seventh Circuit found the plaintiffs' pleading lacking in two respects. First, the plaintiffs' complaint failed to allege how the alleged association-in-fact shared a common purpose, which is an "essential ingredient" of a RICO claim. *Id.* The court reasoned that the alleged association could not have a common purpose because each member of the associated group had different goals: defendant wanted to pay lower wages, the recruiter organization wanted to be paid for more services rendered, and the Chinese Mutual Aid Association wanted to help members of its ethnic group get jobs. *Id.* Second, even if the plaintiffs' adequately pled the existence of an enterprise, their pleading failed to allege that any defendant operated the association-in-fact. *Id.*

*Baker*, while interesting, is not the law of this Circuit, and would likely not be good law in this Circuit. In *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374 (2d Cir.2001), the Second Circuit concluded that pleading the existence of an association-in-fact consisting of employment placement services, labor contractors, newspapers, and "various immigrant networks" that help illegal aliens obtain employment was sufficient to withstand a motion to dismiss. *Id.* at 379.

Moreover, even if *Baker* were the law here, the plaintiffs' allegations sufficiently plead an association-in-fact. Both the

original and the amended complaints allege that the association-in-fact operated under the direction of defendants, so that the enterprise could procure illegal aliens for employment by EMC. All three entities—EMC, Mahoney and American Latin—entered into this association to make money. EMC and Mahoney would make money by depressing wages, and American Latin would profit by receiving a fee for each worker it provided the defendants. All "therefore had a stake in the success of the other," *Zito*, 2004 WL 2211650, at *8, because their ability to make money depended on the efforts of each party. These allegations are enough to satisfy the "common purpose" requirement. *See id.*

The plaintiffs' complaint also sufficiently alleges an entity that is distinct from its members. In *Baker*, the court found the plaintiffs' failed to allege a distinct entity because the plaintiffs alleged that the named defendant "operates *itself* unlawfully ... [by] hir[ing], harbor[ing] and pay[ing] the unlawful workers." *Baker*, 357 F.3d at 691. Here, the plaintiffs' allegations, taken as true, are different. They allege that EMC and Mahoney direct American Latin to find illegal aliens for EMC job sites, and once found, American Latin's pool of illegal workers "take direction from EMC's foremen and supervisors, but are paid [the reduced wage] by American Latin." (Compl. ¶ 26; Am. Compl. ¶ 27.) Thus, the complaints allege RICO persons (Mahoney and EMC) who are legally separate from the RICO enterprise (EMC–Mahoney–American Latin association-in-fact), which operates for a common purpose. *See Smokes–Spirits*, 541 F.3d at 447 (noting the distinctness requirement and proof of an association-in-fact are met by showing that the third party added to the enterprise shares a common purpose with the enterprise).

## B. The Original Complaint Fails To Plead That The Members of The Enterprise Committed A Predicate Act Through A Pattern of Racketeering Activity

For a plaintiff to plead a substantive violation of the RICO statute, he "must [allege] a pattern of racketeering activity, and to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation". *Spool*, 520 F.3d at 183. Thus, claims under both section 1962(c) and (d) require that a plaintiff allege a pattern of racketeering activity. "To survive a motion to dismiss, this pattern must be adequately alleged in the complaint." *Id.* (quotation and citation omitted).

The plaintiffs' original complaint alleges that defendants engaged in a "pattern of racketeering activity" by knowingly hiring numerous illegal aliens in violation of Section 274(a)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1324(a), a RICO predicate offense. 18 U.S.C. § 1961(1)(F) ("any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens)").

Section 274(a)(3) provides:

(A) Any person who, during any 12–month period, knowingly hires for employment at least *10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B)* shall be fined under title 18 or imprisoned for not more than 5 years, or both.

(B) An alien described in this subparagraph is an alien who—

(i) is an unauthorized alien (as defined in section 1324a (h) (3) of this title),[1] and

_____

1. Section 1324a(h)(3) defines an unauthorized alien as, "with respect to the employment of

an alien at a particular time, that the alien is

·· (ii) *has been brought into the United States* in violation of this subsection.

8 U.S.C. § 1324(a)(3) (emphasis added). In this Circuit, it has long been that law that a plaintiff relying on section 273(a)(3) as a predicate act must allege both that the defendant knowingly hired illegal aliens and that the defendant "had actual knowledge that the illegal aliens it hired were *brought into the country in violation of the statute*" *Commercial Cleaning*, 271 F.3d at 387 (*citing Sys. Mgmt., Inc. v. Loiselle*, 91 F.Supp.2d 401, 408 (D.Mass. 2000)) (emphasis added), in order to plead a violation of section 274(a)(3).

The plaintiffs' original complaint fails to allege a violation of section 274(a)(3). The original complaint does not contain the necessary allegation that defendants knew that at least 10 of the aliens they hired were brought into the country by someone else (as opposed to getting here on their own).

Congress wrote two different statutes addressing the hiring of illegal aliens. One entitled "Unlawful employment of aliens" makes it illegal to hire illegal aliens knowing that the aliens are not authorized to work. 8 U.S.C. § 1324a.[2] A violation of this statute is not a RICO predicate act. The other makes it illegal knowingly to hire illegal aliens who are known to have been smuggled ("brought") into the United States. 8 U.S.C. § 1324. A violation of that statute is a RICO predicate act.

The key difference between the two statutes is the employer's knowledge of how the illegal alien arrived in the United States. If the employer does not know that at least 10 of its illegal hires were "brought into" the country by some third party (as opposed to walking across the border themselves, or arriving on a visitor's or student visa and overstaying their welcome), then it has not committed a RICO predicate act by hiring them—even though it has committed a federal crime by knowingly hiring the aliens without regard to how they entered the country.

In *Commercial Cleaning*, the Second Circuit discussed this critical distinction. Although sustaining most of the allegations of a complaint remarkably similar to this one, it held that a district court had properly dismissed the complaint because the plaintiffs failed to allege that the defendants knew when they hired the aliens that at least 10 of them had been "brought into" the United States. *Commercial Cleaning*, 271 F.3d at 387. After *Commercial Cleaning*, it is not enough for a plaintiff to allege that the defendants hired

not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General." 8 U.S.C. 1324a(h)(3).

2. The relevant section of the statute provides:

It is unlawful for a person or other entity—
(A) to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3) of this section) with respect to such employment, or
(B)
(i) to hire for employment in the United States an individual without complying

with the requirements of subsection (b) of this section or
(ii) if the person or entity is an agricultural association, agricultural employer, or farm labor contractor (as defined in section 1802 of title 29), to hire, or to recruit or refer for a fee, for employment in the United States an individual without complying with the requirements of subsection (b) of this section.
(2) It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1), to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.
8 U.S.C. § 1324a(a)(1)-(2).

illegal aliens-or even that they did so knowingly. Rather, a plaintiff must allege that the defendant knew *both* that at least 10 of its employees were undocumented aliens *and* that those 10 employees arrived in the United States in a manner that qualifies as being "brought" here. Moreover, the plaintiffs must plead facts tending to show that the statute specified by Congress as a predicate act was violated. *See id.*

The original complaint in this case says not a word about the defendants' knowledge of how any of their illegal alien employees entered the United States. *Commercial Cleaning,* which is binding on this Court, thus compels dismissal of the original complaint.

Because the original complaint must be dismissed, the Court will not here discuss whether it pleads proximate cause—the third and final pleading requirement under RICO. The Court reserves that discussion for the amended complaint.

After dismissing the *Commercial Cleaning* complaint on the technical ground discussed above, the Second Circuit determined that the case should be remanded to give the plaintiff the chance to add the missing allegations to their complaint. *Id.* at 387 n. 5. Knowing this, the plaintiffs have cross-moved for leave to amend the complaint and have proffered a proposed amended pleading that purports to cure the deficiencies of the original.

The proposed amended complaint does two things. First, it includes several conclusory allegations that are obviously intended to allege that defendants knew some of their illegal alien employees had been smuggled into the country by third parties. Those allegations are factually insufficient to allege the requisite knowledge.

Second, the proposed amended complaint adds a wholly new predicate act allegation. It charges that the defendants violated a different law, 8 U.S.C. § 1324(a)(1)(A)(iii) (also known as section 274(a)(1)(A)(iii) of the Immigration and Nationality Act), by harboring the illegal aliens who they employ on multiple occasions. 18 U.S.C. § 1961(1)(F). This proposed amendment fails to state a RICO claim, because it fails to allege proximate cause.

## C. The Proposed Amended Complaint Still Fails to Plead a Violation of Section 274(a)(3)

As far as the alleged section 274(a)(3) predicate act allegations are concerned, the plaintiffs' proposed amended pleading fails to cure the deficiencies of the original complaint.

The recent Supreme Court decision of *Bell Atlantic v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), makes it clear that purely conclusory allegations about defendants' knowledge of the means by which their employees entered the United States insufficient. In *Twombly,* the Supreme Court reversed and remanded a decision denying a motion to dismiss a complaint for failure to state a claim. The plaintiffs brought a putative class action against major telecommunications providers, alleging an antitrust conspiracy in violation of the Sherman Act, 15 U.S.C. § 1. The question presented was whether the complaint should be dismissed because the plaintiffs failed to allege any facts tending to show that two or more parties had entered into an agreement to violate the antitrust laws. The pleading alleged no more than parallel conduct, together with a conclusory claim that the defendants conspired to violate the antitrust laws.

The Supreme Court, reversing the Second Circuit, held the pleading failed to state a claim. *Twombly,* 550 U.S. 544, 556, 127 S.Ct. at 1966. In its ruling, the Su-

preme Court announced that the standard applied to pleadings on Rule 12(b)(6) motions to dismiss for half a century—that a complaint should be dismissed only if "it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added)—had "earned its retirement." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969.

The Supreme Court justified the imposition of a somewhat more stringent test at the pleading stage by noting the toll that civil litigation takes on defendants. *Id.* at 1967. In some cases, allowing a plaintiff's threadbare claim to proceed gives rise to an "in terrorem" effect where, "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases . . . ." *Id.* The Court's solution to this problem was simple: "It is only be taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence." *Id.* (quotation and citation omitted).

While the scope of *Twombly* was initially murky, *see, e.g.*, McMahon, *The Law of Unintended Consequences: Shockwaves in the Lower Courts*, 41 Suffolk U.L.Rev. 851, 852–53 (2008), it is by now clear that the case applies in more than antitrust cases. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n. 2 (2d Cir.2007); *Iqbal*, 490 F.3d at 157. Indeed, the Second Circuit has indicated that there are certain types of cases where *Twombly* "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal*, 490 F.3d at 157–58 (emphasis in original). A civil RICO case is just such a case.

A civil RICO lawsuit has vast implications for the defendants because of the specter of treble damages and the possibility of permanent reputational injury to defendants from the allegation that they are "racketeers." Courts have frequently commented on the "in terrorem" settlement value that a threat of a civil RICO claim creates. *See, e.g., Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir.2008); *Nakahara v. Bal*, 97 Civ.2027, 1998 WL 35123, at *9 (S.D.N.Y. Jan.30, 1998). The concerns about the impact of civil antitrust litigation that were articulated by the Supreme Court in *Twombly* (see above) are equally, if not moreso, applicable to civil RICO claims. That should not be surprising, since the civil RICO statute was modeled on the Sherman Act. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) (discussing same).

If *Twombly* means anything, it means that, "Bald assertions and conclusions of law will not suffice. The pleadings must create the possibility of a right to relief that is more than speculative." *Spool*, 520 F.3d at 183. (quotations and citations omitted). Therefore, after *Twombly*, a plaintiff in a civil RICO lawsuit must plead some facts tending to show that his ultimate conclusion is "plausible." In connection with the allegation that defendants violated the section 274(a)(3)—the alleged predicate act that gives rise to a purported "pattern of racketeering activity"—*Twombly* means that the plaintiffs must plead some facts tending to show that these particular defendants actually knew that at least 10 of the illegal aliens they knowingly hired were brought into this country by some third party (or, as some courts have phrased it, were smuggled in) so that they could work illegally in the United States.

The Court has carefully reviewed the proposed amended pleading. It does not

contain any factual allegation tending to make plausible their ultimate (and wholly conclusory) contention that the defendant knew that they were hiring 10 illegal aliens who had been "brought" into this country.

The amended complaint alleges:

66. Upon information and belief, defendants EMC and Mahoney have knowingly hired 10 or more individuals each calendar year since 2004 with actual knowledge that the workers were not authorized to work in the U.S. and had been brought into the U.S. in violation of § 1324.

(Am.Compl.¶ 66.) That is a purely conclusory allegation, pleaded on information and belief. However, it is not supported with any factual allegations tending to show that defendants in fact had such knowledge. Neither is there any disclosure of the basis for plaintiffs' "belief" that defendants knew that at least 10 of the aliens they hired each year "ha[d] been brought into the United States." 8 U.S.C. § 1324(a)(3)(B)(ii). Undocumented workers arrive in this country in many ways. Nothing in the proposed amended complaint suggests why these defendants knew, or should have known, that any of the people they hired arrived in the United States in any particular way.

The amended pleading contains a number of new allegations (again, nearly all of which are pleaded on information and belief) that did not appear in the original complaint and that I presume are intended to bolster the conclusory allegation that defendants knew how their illegal employees got into the country:

1. As many as 7.2 million unauthorized migrants are employed in the United States, and as many as 14% of all workers in the construction industry are illegal aliens.

2. Neither defendants nor American Latin Services Enterprises Corp., the business that supplied many of their workers, (a) complied with their legal obligations to obtain proof of identity from the workers they hired/supplied; (b) asked employees to sign Form W–4 so that taxes and other deductions could be withheld from their wages; (c) carried out the necessary withholdings.

3. The reason they did not do these things was that they well knew the persons who were being hired/supplied were illegal aliens—indeed, it was "common knowledge" within the company.

4. Defendants hired illegal workers in order to drive wages down.

(Am.Compl.¶¶ 1–4.) Unfortunately for the plaintiffs, none of these factual allegations tends to show that the defendants named in the caption knew how their undocumented alien employees arrived in this country. They tend only to show the defendants knew they were hiring illegal aliens—which, while a violation of federal law (8 U.S.C. § 1324a), is not a RICO predicate act.

Finally, plaintiffs assert, in paragraph 74:

At a minimum, given the highly publicized and comprehensive measures undertaken by the federal government, especially since 2001, to safeguard our borders and prevent unauthorized entry into the U.S. and to criminal [sic] employers who hire illegal workers, defendants knew or should have known that the illegal workers they hired were brought into the U.S. in violation of § 1324.

(Am.Compl.¶ 74.) Again, not a single fact is pleaded that gives rise to the conclusion articulated in this paragraph. While the Court has no way of knowing for sure what proportion of illegal workers were *not* smuggled in by a third party, it is clear from the Court's criminal docket that many undocumented aliens who are working in this country arrived on their own

and were not "brought into" the country. Plaintiffs allege no fact tending to show that the Government's "highly publicized and comprehensive measures" are limited to those aliens who were smuggled into the country. Rather, they have been addressed to any and all undocumented workers. Without pleading any facts tending to show that *these* defendants knew that they were hiring aliens who had been smuggled in—for example, an allegation that defendants hired workers directly from persons who brought aliens into the United States, or from persons who were known to work with smugglers—plaintiffs fall short of what the law requires. *See Twombly*, 550 U.S. 544, 557, 127 S.Ct. at 1966. No such allegations are made here.

The Court recognizes that there are other, earlier cases, in which conclusory allegations of the sort plaintiffs here plead have survived a Rule 12(b)(6) motion to dismiss on the ground that section 274(a)(3) violations were not sufficiently pled. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277 (11th Cir.2006); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002).[3] Their precedential value is limited, however, because they precede *Twombly*, and so were being judged under the now-retired "no set of facts" standard.

### D. The Proposed Amended Complaint Sufficiently Alleges A Violation of Section 274(a)(1)(A)(iii)

 The plaintiffs also try to cure the defect in their original complaint by adding an entirely new RICO predicate act allegation. They allege that defendants "harbored" illegal aliens in violation of section 274(a)(1)(A)(iii), which provides:

Any person who knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation

8 U.S.C. § 1324(a)(1)(A)(iii). To plead a violation of this statute, a plaintiff must allege both that (1) the "person" knew or recklessly disregarded the alien's unlawful status, and (2) the "person" took steps that were intended to help the illegal alien remain undetected. *See United States v. Kim*, 193 F.3d 567, 574–75 (2d Cir.1999). Violation of section 274(a)(1)(A)(iii) is a RICO predicate act.

 Within the meaning of this statute, harboring "encompasses conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence." *Id.* at 574 (citation omitted). Harboring comprises a wide range of conduct, including providing illegal aliens housing, transportation, arranging sham marriages, assisting them in getting employment, teaching them to hide their illegal identity, and *"shelter[ing] [illegal aliens] from the immigration authorities and shield[ing] [them] from observation to prevent their discovery." Id.* (citations omitted) (emphasis added).

Plaintiffs' proposed amended pleading sufficiently alleges that, on at least two occasions in the last ten years, the defendants harbored the illegal aliens they had

---

**3.** If *Commercial Cleaning* had reached such a result, this Court would be bound by the Circuit's decision. However, *Commercial Cleaning* reached the opposite result—the Circuit ruled that the plaintiffs had not alleged a violation of section 273(a)(3). I suspect that, in 2002 or 2003, the Second Circuit, confronted by a pleading like plaintiffs' here, might well have concluded that it was sufficient at the motion to dismiss stage. But no such ruling was ever made, to my knowledge, and *Twombly* changes the landscape considerably.

hired. The amended complaint alleges that defendants knew (or recklessly disregarded) their employees' undocumented status.

> 67. Upon information and belief, it was common knowledge within EMC that their workers were not authorized to work in the U.S. In fact, EMC's own supervisors and/or foremen were illegal aliens. Many of EMC's workers sought out employment with EMC, because they knew that EMC hired illegal workers, and therefore they would not be required to show proof of employment eligibility.

(Am.Compl.¶ 67.)

It also alleges that defendants attempted to hide their undocumented workers from the government:

> 68. In an effort to shield their illegal workers from detection, EMC, and American Latin intentionally did not complete I–9 forms or asked their employees to complete W–4 forms.
>
> * * *
>
> 70. In an further effort to conceal, shield, and/or harbor their illegal workers, EMC would shut down the jobsite if they thought government authorities would be conducting a raid.
>
> * * *

(Am.Compl.¶¶ 68, 70.) These allegations of actions and omissions by defendants— failing to complete forms, shutting down job sites when inspections were anticipated are sufficient to state a claim for violation of section 274(a)(1)(A)(iii). *See Kim,* 193 F.3d at 574–75.

Moreover, plaintiffs allege that defendants hired numerous undocumented aliens during a four year period, so the complaint satisfies the requirement that there be more than one predicate act of harboring during a 10 year period. 18 U.S.C. § 1961(5); *Spool,* 520 F.3d at 183.

The defendants contend that these allegations do not show that the defendants "substantially" facilitated the illegal aliens' unlawful stay in the United States. However, the Second Circuit has already decided that hiding aliens from immigration authorities violates the statute. *Kim,* 193 F.3d at 574 (*citing United States v. Herrera,* 584 F.2d 1137, 1145 (2d Cir.1978)). In *Herrera,* this Circuit held that installing a security system designed to alert illegal aliens of an impending governmental raid or inspection to help the illegal aliens escape detection constitutes harboring. 584 F.2d at 1145. The allegations here are that the defendants (1) failed to complete legally required paperwork in order to conceal the presence of aliens on their payroll, and (2) shut down job sites when they thought the government would conduct a raid.[4] Shutting down a jobsite to prevent a detection is no different than putting an alarm bell on a site to tell the illegal aliens to run away; and both of the activities alleged are designed to prevent the government from finding people who would be subject to deportation.

Therefore, the amended pleading cures the original complaint's failure to plead a "pattern of racketeering activity" by pleading a "pattern" of harboring illegal alien workers.

### E. The Proposed Amended Complaint Does Not Plead Racketeering Injury/Proximate Cause

 A plaintiff only has standing to sue under section 1964(c) if the alleged RICO violation was the proximate cause of the plaintiff's injury. *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 453, 126 S.Ct.

---

**4.** The amended complaint would be improved if defendants were able to allege that this occurred on more than one occasion.

1991, 164 L.Ed.2d 720 (2006) (*citing Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *see also Commercial Cleaning*, 271 F.3d at 380. To allege proximate cause, a plaintiff must show, " 'some direct relation between the injury asserted and injurious conduct alleged." *Smokes–Spirits*, 541 F.3d at 440 (*quoting Holmes*, 503 U.S. at 268, 112 S.Ct. 1311). In other words, "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547 U.S. at 461, 126 S.Ct. 1991.

In evaluating whether the plaintiff's alleged violation meets this "directness" requirement, courts should consider the policy reasons behind it. *See id.* at 458–60. The Supreme Court has identified three reasons for requiring a direct connection between the alleged RICO violation and the plaintiff's injury:

> (1) the factual difficulty of measuring indirect damages and distinguishing among distinct independent causal factors; (2) the complexity of apportioning damages among plaintiffs to obviate the risk of multiple recoveries; and (3) the fact that the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law.

*Smokes–Spirit*, 541 F.3d at 440 (*citing Holmes*, 503 U.S. at 269, 112 S.Ct. 1311) (quotations omitted).

In *Holmes, supra*, Securities Investor Protection Corporation ("SIPC") claimed that one Robert Holmes conspired with others to manipulate stock prices. SIPC asserted that Holmes and others had conducted an enterprise through a pattern of racketeering activity consisting of multiple stock manipulations in violation of the federal securities laws—which are predicate acts. Nonetheless, the Supreme Court held that SIPC lacked standing to maintain a RICO claim against Holmes, because SIPC's injury—which derived from its subrogation to the claims of Holmes' defrauded customers—was not proximately caused by Holmes' conduct. *Id.* at 276, 112 S.Ct. 1311. The Court—applying settled principles of causation under the antitrust laws to civil RICO claims—announced that there had to be some direct relationship between the injury asserted and the injurious conduct alleged. *Id.* at 265–68, 112 S.Ct. 1311. In a much-quoted passage, the Court announced that the plaintiff must show that the defendant's violation "not only was 'but for' cause of his injury, but was the *proximate cause* as well." *Id.* at 268, 112 S.Ct. 1311 (emphasis added). In subsequent cases, the Second Circuit has equated "but for" and "proximate" cause with "transaction" and "loss" causation. *See, e.g., McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008).

In *Anza, supra*, the Supreme Court applied the rationale of *Holmes* to a civil RICO case where the plaintiff (Ideal) was the principal competitor of the defendants' alleged enterprise (National). Ideal alleged that National and its principals injured it by failing to charge New York sales tax to cash-paying customers, which allowed defendants to reduced National's prices without affecting its profit margins. *Id.* at 453–54, 126 S.Ct. 1991. National concealed its conduct by submitting fraudulent tax returns to the New York State Department of Taxation, sending them by mail (mail fraud) and electronically (wire fraud). *Id.* at 454, 126 S.Ct. 1991.

Overturning the Second Circuit's decision sustaining the pleading under Rule 12(b)(6), the Supreme Court described Ideal's theory in the following terms: "Ideal's

theory is that Joseph and Vincent Anza harmed it by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers." *Id.* at 457–58, 126 S.Ct. 1991. But it then went on to say, "The cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458, 126 S.Ct. 1991. The Court concluded that this ran afoul of the proximate cause requirement of Section 1962(c). *Id.*

The Supreme Court observed that the directness requirement announced in *Holmes* was designed in part to mitigate "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action ... the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Id.* at 458, 126 S.Ct. 1991 (*quoting Holmes,* at 269, 112 S.Ct. 1311). It noted both that National could have lowered its prices for any number of reasons—or not lowered its prices even though it was committing tax fraud—and that Ideal might well have lost sales for reasons other than National's alleged acts of fraud. All of this rendered damages to Ideal "speculative" while failing to avoid the "types of intricate, uncertain inquiries" that a proximate cause requirement "is meant to prevent." *Id.* at 460, 126 S.Ct. 1991. The Court also concluded that a direct causal connection was imperative in a case where some more immediate victim of an alleged RICO violation—in *Anza,* the State of New York—could be expected to vindicate the law by pursuing its own claim, a claim that would (unlike Ideal's injury) be easy to prove.

In evaluating whether the plaintiffs have adequately alleged proximate cause in this case, the Court focuses on the proposed amended complaint, because it adequately alleges the commission of a pattern of racketeering activity, to wit: two or more violations of the harboring statute. The question to be answered is whether the plaintiffs' injury—the depression of their wages—was proximately cause by defendants' hiding their illegal alien employees from the Government. The answer to that question is no.

There is no direct relationship between the harboring of illegal aliens and the plaintiffs' depressed wages. Indeed, plaintiffs do not so allege. Rather, they contend that they were paid below-market wages because the defendants knowingly hired undocumented workers, who would and did work for wages that were lower than the prevailing rate. That act—the knowing hiring of illegal aliens—is specifically alleged to be the proximate cause of plaintiffs' lower wages. (Am.Compl.¶¶ 45, 94, 109, 119, 128, 132.) As explained above, that act is not a RICO predicate act.

If plaintiffs had managed to plead that defendants knowingly hired 10 or more illegal aliens who defendants knew had been "brought into" the country—that is, if plaintiffs had successfully pled a violation of section 274(a)(3), which is a RICO predicate act—their proposed amended complaint might well plead proximate cause, as the Second Circuit found in analogous circumstances in *Commercial Cleaning,* 271 F.3d at 381–385. Of course, *Commercial Cleaning* is a pre-*Anza* case, so if plaintiffs had managed to plead that defendants knew some of their illegal employees had been "brought into" the country by others, this Court would have to consider whether *Commercial Cleaning* remains good law on this point. But plaintiffs' failure to allege the requisite specific facts moots any such inquiry.

Because hiring illegal aliens without knowing they were "brought in" is not racketeering activity, plaintiffs' allegation that hiring illegal aliens depressed wages—a correlation long recognized by courts, including the Supreme Court, *see, e.g., DeCanas v. Bica,* 424 U.S. 351, 356–357, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)-does not satisfy the requirement that plaintiffs plead injury caused by a pattern of racketeering activity. To clear that hurdle, plaintiffs need to plead facts tending to show that defendants' harboring of illegal aliens proximately caused the drop in their wages. This they have not done.

Reading the plaintiffs' proposed amended complaint in the most favorable light, they do allege that the defendants were able to keep their "scheme" to employ illegal aliens going by hiding the aliens from the Government—by "harboring" them. (*See* Am. Compl. ¶¶ 25–45, 64, 67–73, 76.) But the fact that harboring may have allowed the alleged injury to persist for a longer period does not mean that harboring caused the injury.

Furthermore, that the only allegation in the amended complaint connecting harboring and wages concerns the duration of the harm rather than its cause underscores another critical point. "The key reasons for requiring direct causation include avoiding unworkable difficulties in ascertaining what amount of the plaintiff's injury was caused by the defendant's wrongful action as opposed to other external factors." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 770 (2d Cir. 1994). Any effort to quantify how much of plaintiffs' depressed wages was caused by the harboring of illegal aliens, as opposed to hiring them or some other factor at work in the marketplace, would be even more inherently speculative than the proceeding anticipated (and condemned) by the Supreme Court in *Anza.*

Finally, because harboring is a direct affront to the Government, there is no need for private attorneys general like plaintiffs to bring damages actions in order to redress it. Just as the State of New York could be expected to pursue a corporation that was failing to pay state income tax, the Government can be expected to vindicate the laws against hiding aliens from the Government. This is not to say that proximate cause will be lacking every time a governmental entity has an interest in vindicating its laws. Indeed, any such result would effectively wipe the civil RICO statute off the books, since every RICO violation is predicated on a violation of some federal criminal statute—a violation that the United States, a "victim" whenever its laws are violated, has an incentive to remedy. However, in this case, where there is no direct or obvious connection between the racketeering activity alleged (harboring) and the harm to the plaintiffs (depressed wages), the fact that the direct victim of the harboring has the incentive to redress the harm (by capturing and deporting the aliens and by prosecuting the harboring employer) fatally undermines any contention that these plaintiffs have suffered injury *by virtue of* the alleged racketeering activity.

The amended complaint thus fails to state a claim under 18 U.S.C. § 1962(c). Because plaintiffs fails to plead any RICO violation, they also fail to plead any violation of 18 U.S.C. § 1962(d), the RICO conspiracy statute. All three RICO counts—Counts I, II and III—are dismissed.

## F. Further Leave to Replead the Civil RICO Claims is Denied

In *Commercial Cleaning,* 271 F.3d at 387, after concluding that the predicate act allegations were deficient, the Second Circuit remanded so that plaintiffs who failed

to allege that defendants knew that at least 10 illegal aliens they had hired were "brought into" the country could insert that allegation into their pleading. Here, there is no need to grant leave to amend for that purpose, because plaintiffs have already proffered a proposed amended pleading to the Court and it has been accepted and examined. Despite knowing how defendants were attacking their original pleading, plaintiffs failed to plead all the necessary elements of a violation of section 274(a)(3). Furthermore, plaintiffs cannot possibly allege that defendants' harboring of illegal aliens in violation of section 274(a)(1)(A)(iii) proximately caused their injury. Therefore, Counts I, II and III of the amended complaint are dismissed with prejudice.

## IV. Plaintiffs' Antitrust Claims are Dismissed

### A. Plaintiffs' Sherman Act Claims

Section 1 of the Sherman Act prohibits, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ...." 15 U.S.C. § 1. "To establish a § 1 violation, a plaintiff must produce evidence sufficient to show: (1) a combination or some form of concerted action between *at least two legally distinct economic entities;* and (2) such combination or conduct constituted an unreasonable restraint of trade either per se or under the rule of reason." *Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 95–96 (2d Cir.1998) (emphasis added). Thus, a § 1 plaintiff must allege that the defendants entered into some type of an agreement (tacit or express) with a separate entity. *Id.; see also Twombly,* 550 U.S. at ——, 127 S.Ct. at 1964 ("the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express") (quotation and citation omit-

ted). This is because "it is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

In this case, the original pleading failed to allege an agreement. All the allegedly anticompetitive activity was committed by defendants in the course of running their own business. (*See* Compl. ¶ 77) ("defendants Mahoney, EMC Contracting, Inc., EMC New York Contracting, and EMC of New York, Inc., have willingly conspired to depress the wages of all its hourly workers in order to underbid competitors for projects, and thereby make substantial profits.") Thus, the plaintiffs fail to plead that two separate entities entered into an agreement.

■■ The amended complaint alleges that the defendants had an agreement with American Latin to depress wages. However, the Court need not decide whether this contention solves the problem, because there is a more fundamental problem: plaintiffs have not suffered any antitrust injury and lack standing to sue under the antitrust laws.

A private plaintiff may not recover damages under the antitrust laws unless it demonstrates that it has suffered an "antitrust injury." *Atlantic Richfield Co., v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Courts colloquially refer to this requirement as "antitrust standing." It is entirely distinct from standing under Article III of the Constitution. An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). "To

demonstrate antitrust injury, a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Arista Records LLC v. Lime Group LLC*, 532 F.Supp.2d 556, 568 (quotation and citation omitted). "Thus, the antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.* 467 F.3d 283, 290 (2d Cir.2006) (quotation and citation omitted). Antitrust standing serves the same function as RICO proximate cause (which, as noted above, derives from antitrust standing).

In addition, even if a plaintiff adequately alleges an antitrust injury, he may lack standing for other reasons. These include:

(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Id.* at 291.

Plaintiffs here allege that defendants committed an antitrust violation by hiring illegal workers to depress wages. Their alleged "antitrust injuries" are that 1) defendants' actions harmed competition by allowing them to underbid competitors for jobs by using cheap labor, and 2) defendants illegally inflated the labor pool of available workers by hiring workers based on the wages they would accept, instead of the workers' skill.

These conclusory allegations do not plead an antitrust injury.

Plaintiffs fail to allege how the use of illegal labor caused harm to competition in the market, rather than the competitors themselves or the workers. *See Mathias v. Daily News, L.P.*, 152 F.Supp.2d 465, 479 (S.D.N.Y.2001) (*citing Brunswick*, 429 U.S. at 488, 97 S.Ct. 690); *see also Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir.1993) ("Plaintiff bears the initial burden of showing that the challenged action has had an actual *adverse effect on competition as a whole in the relevant market*") (emphasis added). If defendants are able to underbid their competitors for jobs, plaintiffs are not the parties who are directly injured—defendants' competitors are.

Moreover, the second alleged antitrust injury—that defendants inflated the size of the labor pool—is the antithesis of an injury to competition, which is the type of injury the antitrust laws are intended to prevent. Defendants' complaint is not about too little competition in the market for construction labor, but too much. It is plaintiffs who are trying to "suppress competition" here, by decreasing the number of available construction workers and so driving up the price for their services. The idea that it harms competition to have more people competing for jobs, or if there are workers in the market who will compete for jobs by cutting the price (i.e., by accepting a lower wage), is ludicrous. Defendants are trying to use the antitrust laws to redress a violation of the immigration laws. It simply does not work.

Accordingly, the defendants' motion to dismiss plaintiffs' federal antitrust claim is dismissed with prejudice.

## B. Plaintiffs' Donnelly Act Claim

In addition to bringing a federal antitrust claim, the plaintiffs assert New York's counterpart to the Sherman Act, the Donnelly Act, N.Y. Gen. Bus. Law. § 340 *et seq.* The Donnelly Act provides;

*Every contract, agreement, arrangement or combination* whereby

A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby

Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained or whereby

For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void.

N.Y. Gen. Bus. Law. § 340 (emphasis added). The Donnelly Act was modeled after the Sherman Act. *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 463, 381 N.Y.S.2d 426, 344 N.E.2d 357 (1976). In fact, it is often called the "Little Sherman Act" *Anheuser–Busch v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 520 N.E.2d 535 (1988), and courts are instructed that Donnelly should generally "be construed in light of Federal precedent and given a different interpretation *only where State policy, differences in the statutory language or the legislative history justify such a result." Id.* (emphasis added). Thus, if the plaintiffs do not have standing to assert a federal antitrust claim, they do not have standing to bring a Donnelly Act claim. *See, e.g., G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 766 (2d Cir.1995) (dismissing federal and state antitrust claims for failure to allege an antitrust injury); *Bio–Technology Gen. Corp. v. Genentech, Inc.,* 886 F.Supp. 377, 383 (S.D.N.Y.1995) (applying federal standard to Donnelly Act claim); *Ho v. Visa U.S.A., Inc.,* 16 A.D.3d 256, 257, 793 N.Y.S.2d 8 (1st Dep't 2005) (same); *Friedman v. E.R. Squibb & Sons, Inc.,* 125 A.D.2d 539, 509 N.Y.S.2d 616 (2d Dep't 1986) (same); *Lerner Stores Corp. v. Parklane Hosiery Co., Inc.,* 86 Misc.2d 215, 381 N.Y.S.2d 968, 969–70 (N.Y.Sup.Ct.1976), *aff'd,* 54 A.D.2d 1072, 388 N.Y.S.2d 760 (4th Dep't 1976) (same).

The plaintiffs argue that the addition of the word "arrangements," which does not appear in the Sherman Act, broadens the scope of the State's antitrust law and gives them standing. They are wrong. In *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 381 N.Y.S.2d 426, 344 N.E.2d 357 (1976), the New York Court of Appeals affirmed the dismissal of the plaintiffs complaint. *Id.* at 461–62, 381 N.Y.S.2d 426, 344 N.E.2d 357. The Attorney General of New York claimed the defendant violated the Donnelly Act by engaging in unilateral price discrimination. He argued that the addition of the word "arrangements" to the Donnelly Act made the state antitrust law broader than the federal law, in that the state law prohibited any "practice" effecting restraint of trade. *Id.* at 464, 381 N.Y.S.2d 426, 344 N.E.2d 357.

The New York Court of Appeals soundly rejected this argument:

Although undoubtedly the sweep of Donnelly may be broader than that of Sherman, we conclude that under the familiar canon of statutory construction, *noscitur a sociis,* the term, "arrangement", *takes on a connotation similar to that of the other terms with which it is found in company, and thus must be interpreted as contemplating a reciprocal relationship of commitment between two or more legal or economic entities similar to but not embraced within the more exacting terms,* "contract", "combination" or "conspiracy".... To interpret the word "arrangement" as embracing any "practice", as the Attorney–

General urges us to do, would be unwarranted as a matter of lexicology and, more significant, unjustified in the historical context of the statute. The addition of a conclusory allegation as to the effect of a described practice (here effecting restraint of trade) cannot operate, of course, to bring a one-sided practice which is outside the scope of the statute within its proscription.

*Id.* at 464, 381 N.Y.S.2d 426, 344 N.E.2d 357 (emphasis added).

Therefore, the plaintiffs' Donnelly Act claim (Count V) is also dismissed with prejudice.

## V. The Plaintiffs' Labor Law Claims

Plaintiffs' proposed amended complaint also added new allegations about defendants' failure to comply with applicable labor laws.

### A. Plaintiffs Adequately Allege Fair Labor Standards Act Claims

■■■ Plaintiffs' Sixth Cause of Action alleges that defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, by intentionally refusing to pay them overtime wages and the legally required minimum wage.

Plaintiffs' federal labor and wage claims arise under section 216(b) of the FLSA, which provides a right of action to any employee whose employer violates the provisions of sections 206 or 207, which govern wages and hours, respectively. *See* 29 U.S.C. §§ 206, 207. Section 206(a) requires "Every employer" to pay a minimum wage to "each of his employees ...." 29 U.S.C. § 206. Section 207(a)(1) requires an employer to pay its employees overtime wages. 29 U.S.C. § 207. Under that section, employers must pay employees at a rate of not less than one and one-half times the employee's regular rate for hours worked in excess of forty per week. 29 U.S.C. § 207(a). The type of "work"

covered by this section is defined as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily for the benefit of the employer and his business." *Holzapfel v. Newburgh,* 145 F.3d 516, 522 (2d Cir.1998) (*quoting Tennessee Coal. Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944)).

However, the minimum wage and maximum hour requirements of the FLSA apply only to employees who are "engaged in commerce or in the production of goods for commerce," or who are "employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a); *Boekemeier v. Fourth Universalist Soc'y,* 86 F.Supp.2d 280, 285 (S.D.N.Y.2000). Section 203(s)(i) defines an "Enterprise engaged in commerce," to include any enterprise that has employees "engaged in commerce ..., or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," and that has gross annual revenues of $500,000 or more. *See Velez v. Vassallo,* 203 F.Supp.2d 312, 327–28 (S.D.N.Y.2002).

Plaintiffs allege that, while working for the defendants, the defendants intentionally did not pay them overtime wages. (Am. Compl.¶ 50.) During this time, plaintiffs Moraes and Nichols worked an average of fifty and sixty-five hours per week, respectively, yet were never paid overtime for the extra hours that they worked. (*Id.* ¶¶ 51–52.) Plaintiffs also allege that defendants sometimes paid them by checks, which routinely bounced. (*Id.* ¶ 55.) When their checks bounced, the plaintiffs allege that the defendants failed to pay them altogether, depriving them of the legally required minimum wage. (*Id.* ¶ 147.)

Defendants argue that plaintiffs' complaint, even as amended, fails to adequately allege the elements of their FLSA claims under Federal Rule of Civil Procedure 8(a). (Def. Reply at 15.)

Plaintiffs have sufficiently alleged that they were former employees of defendants EMC. *Zhong v. August August Corp.*, 498 F.Supp.2d 625, 628–29 (S.D.N.Y.2007). In this case, plaintiffs have expressly alleged an employer-employee relationship with the defendants. (*See, e.g.,* Am. Compl. ¶¶ 46–48.) This is more than enough for Rule 8 purposes.

■ Plaintiffs' allegations about defendants' purported violations of minimum wage and overtime provisions satisfy the requirements of Rule 8. "[W]here a plaintiff alleges violations of the FLSA's minimum and overtime wage provisions, the complaint should, at least approximately, allege the hours worked, for which wages were not received." *Zhong*, 498 F.Supp.2d at 628. First, defendants have notice of plaintiffs' legal theory since the complaint expressly references the FLSA. (*See* Am. Compl. Count VI;) *see Gordon v. Kaleida Health*, No. 08 Civ. 378S, 2008 WL 5114217, at *3 (W.D.N.Y. Nov.25, 2008). Second, the pleading provides the factual grounds supporting their claims. As to the overtime claims, plaintiffs have specified the approximate time period they were employed by defendants EMC and the approximate number of overtime hours they each worked per week without receiving overtime pay. (Am.Compl.¶¶ 50–52.) As to the minimum wage violations, plaintiffs allege that, beginning in 2006, defendants gave them bad checks, which deprived them of their earned wages. (*Id.* ¶¶ 53–55.) Although plaintiffs have not alleged how many bad check they each received, such information should be readily available to defendants from their own business records. Thus, plaintiffs' amended pleading "give[s] the defendant[s] fair notice of the [plaintiffs'] claim[s] and the grounds upon which [they] rest[ ]." *Twombly*, 550 U.S. at ——, 127 S.Ct. at 1964; *see also Gordon*, 2008 WL 5114217, at * 4.

The case that defendants cite in support of their argument to the contrary is distinguishable. In *Zhong*, 498 F.Supp.2d at 628, the court dismissed plaintiff's claim that he was denied overtime compensation in violation of section 207. Although the plaintiff alleged that he worked beyond forty hours a week, his pleading only indicated that he worked twenty hours per week. Because the plaintiff's pleading was internally inconsistent, the court held that it failed to state a violation of section 207. *Id.* at 630. Here, plaintiffs' complaint is not inconsistent. They allege that they were not paid overtime and that, on average, they worked over forty hours per week. (Am.Compl.¶¶ 50–52.)

The plaintiffs' amended pleading sufficiently alleges that the defendants "engaged in commerce" under 29 U.S.C. § 203(s)(1). Under this section, there are two ways in which an employer is considered to have "engaged in commerce:" by pleading individual or enterprise coverage. First, for an employee to qualify for individual coverage under the FLSA, he must have personally "perform[ed] work involving or related to the movement of persons or things ... between states." 29 C.F.R. § 779.103. The plaintiffs do not allege that they personally performed such work. Second, for enterprise coverage, the plaintiffs' employer must have engaged in interstate commerce. Plaintiffs satisfy this requirement by alleging that "the monies, supplies, equipment, and illegal workers employed by defendants EMC and provided by American Latin travel in interstate commerce." (Am.Compl.¶ 95); *see, e.g., Shim v. Millennium Group*, No. 08 Civ. 4022, 2009 WL 211367, at *2–3 (E.D.N.Y. January 28, 2009). Courts have noted that

"virtually every enterprise in the nation doing the requisite dollar volume of business is covered by the FLSA." *Archie v. Grand Cent. P'ship, Inc.*, 997 F.Supp. 504, 530 (S.D.N.Y.1998) (*quoting Dunlop v. Indus. Am. Corp.*, 516 F.2d 498, 501–02 (5th Cir.1975)).

■■■ The plaintiffs' complaint also states a claim for FLSA violations against individual defendant Mahoney. "Individuals with significant decision-making authority over a company may be liable as employers under the FLSA." *Gordon*, 2008 WL 5114217, at \* 4 (W.D.N.Y. Nov.25, 2008) (*citing Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 140 (2d Cir.1999)). Plaintiffs allege that "defendant Mahoney is the President of EMC Contracting, Inc., EMC New York Contracting, and EMC of New York, Inc. and as such, is involved in ever aspect of the business of EMC, including, but not limited to, the hiring of its workers." (Am.Compl.¶ 19.) As such, plaintiffs' complaint states an FLSA claim against Mahoney.

■■■ In this case, the FLSA's three year statute of limitations applies. Generally, the FLSA has a two-year statute of limitations, except in the case of willful violations, for which the statute of limitations is three years. *See* 29 U.S.C. § 255(a). Plaintiffs allege that defendants' violations of the FLSA "were willful and intentional," because the defendants consistently failed to pay any overtime wages and gave their employees bad checks. (Am.Compl.¶ 148.) A violation is willful, if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Frasier v. Gen. Elec. Co.*, 930 F.2d 1004, 1008(2d Cir.1991) (*quoting McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)). Thus, the three-year statute of limitations presumptively applies to plaintiffs' FLSA claims, which means that Nichols' claims for willful violations of the FLSA, filed on April 2, 2008, as pled, is timely.

## B. Pendent State Law Claims

In addition, to their federal law claims, plaintiffs also allege that defendants violated New York State Labor Law §§ 190 *et seq.* ("Article 6") and §§ 650 *et seq.*, the state law provisions governing overtime and minimum wage compensation. The relevant portions of the Labor Law do not diverge from the FLSA. *Whalen v. J.P. Morgan Chase & Co.*, 569 F.Supp.2d 327, 329–330 (W.D.N.Y.2008); *Perez v. Jasper Trading, Inc.*, No. 05 Civ. 1725, 2007 WL 4441062, at \*2 (E.D.N.Y. Dec. 17, 2007). *See* N.Y. Comp.Codes R. & Regs. Tit. 12, § 142–2.1 and 2.2. Therefore, plaintiffs have also stated a claim under New York Labor Law, it is appropriate for this court to resolve the federal and state claims in one proceeding.

## Conclusion

For the reasons stated above, the plaintiffs' motion for leave to amend is granted (Docket No. 16). The defendants' motion to dismiss (Docket No. 11) is granted in part and denied in part. Counts I, II, III (the RICO claims), IV and V (the antitrust claims) of plaintiffs' amended complaint are dismissed with prejudice.

This constitutes the decision and order of the Court.